In re BELLMAN FARMS, INC., Debtor.

Bankruptcy No. 384–00017–INH.

United States Bankruptcy Court,
D. South Dakota, N.D.

Dec. 31, 1991.

See also, 86 B.R. 1016.

987

Robert M. Ronayne, Aberdeen, S.D., for Farm Credit Bank of Omaha.

A. Thomas Pokela, Chapter 7 Trustee, Sioux Falls, S.D.

William J. Pfeiffer, Aberdeen, S.D., for debtor.

## MEMORANDUM OF DECISION RE: MOTIONS FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

IRVIN N. HOYT, Chief Judge.

The matters before the Court are the Motion for Determination of Secured Status and Allowance of Administrative Expense [insurance proceeds on vehicles], the Motion for Determination of Priority Claim and Allowance of Administrative Expense [labor], and the Motion for Determination of Secured Status and Allowance of Administrative Expense [machinery lease] filed by Lois Bellman, now known as Lois Vielmette, and the objections thereto filed by Farm Credit Bank of Omaha and Chapter 7 Trustee A. Thomas Pokela. This is a core proceeding under 28 U.S.C. § 157(b)(2). This ruling shall constitute Findings and Conclusions as required by F.R.Bankr.P. 7052.

### I.

The facts of this case are recited in full so that the chronology may be understood better and because the facts are ultimately dispositive of the issues before the Court.[1]

1. The Hon. Peder K. Ecker presided in these cases until they were transferred to the under-signed by Order entered May 17, 1991.

Charles J. Bellman filed a Chapter 11 petition on June 23, 1982. There were no scheduled priority or secured claims. He listed Lois Papousek [subsequently known as Lois Bellman, and now known as Lois Vielmette] as an unsecured creditor with a claim of $3,800.00 for a loan made in December, 1981.

Bellman Farms, Inc., filed a Chapter 11 petition for reorganization on March 13, 1984. According to its Schedules, Charles J. Bellman owned 92% of the stock of this Debtor corporation; three other persons, not including Lois Papousek, owned the remaining stock.

On April 12, 1984, Bellman Farms and Charles Bellman filed a Motion for Joint Administration of Cases. On June 8, 1984, both Debtors filed a Motion for Consolidation of Cases on the grounds that the estates' assets and liabilities were substantially commingled. Joint administration was authorized by Order entered June 12, 1984. Debtors withdrew their Motion for consolidation.

Debtors, Federal Land Bank (FLB), and Production Credit Association (PCA) each proposed a Chapter 11 plan. Debtors' joint plan stated Lois Bellman[2] would act as Debtors' disbursing agent in Charles Bellman's absence during his incarceration.[3] The joint disclosure statement acknowledged Lois Bellman would "co-manage work and operate the Bellman Farms, Inc., operation" with Don Flanigan and Bob Dixon during Charles Bellman's incarceration. This disclosure statement said labor costs in 1982 were $18,306.00 and it projected labor in 1986 would be $26,800.00. Debtors' plan further stated that the debt of $3,800.00 to Lois Bellman was incurred while she was Charles Bellman's fiancee and, therefore, she "is an insider by virtue of having become the Debtor's spouse in March, 1985, this debt will be treated as the debt of an insider and it will not be paid." The share of Debtors' projected labor cost that Lois Bellman was to receive, if any, was not set forth.

A liquidating Chapter 11 plan proposed by PCA was confirmed by Order entered January 28, 1986 and a discharge of debts was entered for Charles Bellman. Debtors appealed that Order. The District Court[4] remanded the case on the limited issue of whether *In re Ahlers*, 794 F.2d 388 (8th Cir.1986), affected the Bankruptcy Court's conclusion that Debtors' proposed plan was fatally flawed under the absolute priority rule.

A hearing on remand was scheduled but never held. By a Settlement Agreement filed September 3, 1987, PCA, Debtors, and Carmen Bellman (Charles Bellman's mother) agreed that certain livestock and machinery in which PCA had a secured interest would be abandoned to PCA by Debtors. PCA was then to dispose of this property in accordance with the Uniform Commercial Code and apply the proceeds to PCA's claim against Debtors. Debtors were not to be liable for any deficiency claim remaining after the disposition of the machinery. The Agreement also provided that certain machinery would be assigned to Carmen Bellman. PCA, Debtors, and Carmen Bellman also agreed to a mutual release of claims against each other. The Agreement specifically provided that it would survive any conversion of the Chapter 11 proceedings to another Chapter and that it would be incorporated into the confirmed Chapter 11 plan. The Court approved the Settlement on September 15, 1987.

After PCA's sale of estate property in October, 1987, pursuant to their settlement agreement with Debtors and Carmen Bellman, Debtors did not have any farm machinery or tractors except some old trucks, some junk vehicles, and a New Holland Baler.

By Order entered December 15, 1987, the Chapter 11 proceedings were converted to Chapter 12 proceedings. A joint Chapter

---

2. Lois Papousek married Charles J. Bellman on March 13, 1985.

3. Charles Bellman commenced an eighteen-month sentence on March 13, 1985 on a federal conviction for converting mortgaged grain.

4. The Honorable Andrew W. Bogue, Senior Judge, presiding.

12 plan was confirmed by Order entered February 26, 1988.[5] The confirmed plan stated Lois Bellman had filed a proof of claim for $3,800.00 against Charles Bellman's estate and that this claim would be treated equally with other unsecured claims. The claims register indicates Lois Bellman did not file a proof of claim in the Chapter 11 proceedings or the Chapter 12 proceedings. Administrative expenses were specifically enumerated in this Chapter 12 plan; they did not include any payments to Lois Bellman for wages or equipment leases. The plan's only projected expenses for 1988, 1989, and 1990 were living expenses and real estate taxes. No expenses for labor or machinery leases were projected. The plan acknowledged Debtors did not have any livestock or machinery to actively farm. All projected income was from rent and lease payments from the farm and wages Charles Bellman would receive from National Farm Management, Ltd., a corporation owned by Lois Bellman.

Like the confirmed plan, the confirmation order entered February 26, 1988 did not acknowledge that any wages or lease payments would be made to Lois Bellman.

The confirmed plan, as it dealt with FLB's claim, was "corrected" by an Order entered April 5, 1988. Further, on June 24, 1988 the Court entered a Memorandum Decision that determined the allowed amount of FLB's secured claim. The Court's conclusions were memorialized in an Order entered July 1, 1988. These post-confirmation Orders and Memorandum Decision did not alter the treatment of Lois Bellman's claim nor acknowledge that the estate would pay Lois Bellman for services performed or to be performed or for equipment leased or to be leased.

Contrary to their confirmed plan, which stated Debtors would lease their real property, Debtors themselves farmed the estate property plus some leased ground from 1987 through August, 1990. They initially had about 5,000 acres with one-half in small grains and hay and the balance in pasture. By 1989, Debtors lost some leas-es and only had approximately 1,000 acres to crop or hay. Debtors made payments as required by the plan for two years and defaulted in the third year.

Debtors moved to modify their plan on January 2, 1990. This motion acknowledged that Debtors had been trying to farm since confirmation and had not rented out their land and buildings as the confirmed plan had proposed. The motion to modify did not specifically mention that any lease or wage payments were paid or owed to Lois Bellman.

Debtors' filed an amended motion to modify on February 9, 1990. This motion also recognized that Debtors had been trying to farm since confirmation of the Chapter 12 plan. It also provided that Lois Bellman would make Debtors' 1990 payment to FmHA and that she would be repaid with interest from Debtors' disposable income.

Chapter 12 Standing Trustee A. Thomas Pokela (Trustee) objected to the amended motion to modify and argued that Lois Bellman should not be treated as a "super unsecured creditor" unless her priority over other unsecured creditors was granted by separate motion and order. Trustee filed another objection on March 29, 1990 and stated:

[T]here is not enough information presented with such [a motion to modify] to determine whether such is feasible and additionally sufficient questions have been raised in the Trustee's mind after the depositions of Debtor Charles J. Bellman to question whether the Debtor is operating in good faith in this bankruptcy in view of the relationship between the Debtor Charles J. Bellman and Lois Bellman and the fact that it appears from such depositions that expenses are being paid on behalf of the corporations of Lois Bellman and/or Lois Bellman for which there is not compensation paid to Debtor Charles Bellmam [sic] or Bellman Farms, Inc., this causing expense to the Debtors for which there is no reimbursement.

<hr/>

**5.** Neither the confirmation order nor Charles Bellman's discharge in the Chapter 11 cases were vacated so it is unclear how another plan could be confirmed in the Chapter 12 or why another discharge for Charles Bellman was entered on December 14, 1990.

Farm Credit Bank of Omaha (FCBO, formerly FLB) moved to dismiss on January 29, 1990 and April 24, 1990. Trustee moved to dismiss the cases on April 9, 1990. One of the grounds for dismissal was:

That Charles Jarl Bellman has purchased various items of equipment through his wife's name and claimed that all payments made upon such equipment are pursuant to some sort of lease arrangement although there is no evidence of any kind of any written leases between Charles Jarl Bellman and his wife.

All interested parties, including Lois Bellman, intensely litigated the motions to dismiss and motions to modify and related discovery requests. In Lois Bellman's affidavit attached to her Objection to Reply and Motion to Strike Richard Wendt Deposition she stated that she does lease equipment to Bellman Farms, Inc., and that Bellman Farms, Inc., is to make her monthly loan payment to AVCO Finance.

Trustee's motion to dismiss was initially heard May 3, 1990. The Court stated that Lois Bellman is an insider and tantamount to Debtor in these proceedings.

Following a hearing held August 6, 1990, in which Debtor Charles Bellman; William J. Pfeiffer, counsel for Debtors; Trustee Pokela; Robert M. Ronayne, counsel for FCBO; Bruce J. Gering, counsel for the United States Trustee; and Lois Bellman participated, the parties reached a stipulation whereby on Debtors' motion the Chapter 12 proceedings would be converted to Chapter 7 proceedings. An Order of conversion was entered August 7, 1990.

According to the transcript of the August 6, 1990 proceeding, the stipulation, as it directly involved Lois Bellman, provided that she would pay Trustee $12,000.00 on September 15, 1990 as compensation for estate livestock and $1,800.00 for the estate's interest in a 1980 Lincoln. Lois Bellman also agreed to relinquish any claim she may have had in machinery or equipment on Debtors' premises except for a GMC van, a Lincoln automobile she purchased in Nebraska, a 1974 Dodge pickup, and a 1980 Ford Thunderbird. She also

could retain a 560 tractor and loader and Powder River chutes and panels that were brought from her farm in Gregory if she could subsequently prove ownership. The parties also agreed that Lois Bellman could keep a generator that was pledged to PCA and some personal property in the house on Debtors' farm. Lois Bellman's corporation, Feather 'N Down, Ltd., was given use of the estate premises until the end of the year and that entity got to keep a 1974 Plymouth Volare and a 1974 Plymouth Fury III. The estate retained the rest of the personalty and livestock, as well as the 1990 crop and unpaid rent. Finally, there was a mutual release among all parties, including Lois Bellman and her corporations National Farm Management, Ltd., Feather 'N Down, Ltd., and FAMINE Incorporated, and her unincorporated business, LoBell Farms. Trustee asked that the stipulation be reduced to writing and submitted for court approval after notice to all parties.

For a few months after the August 6, 1990 hearing, the parties attempted to reduce their oral agreement to writing. They agreed to modify some provisions of the earlier, oral stipulation. All parties except PCA and FLB eventually signed a written stipulation. Consequently, a written version of the August 6, 1990 Stipulation was never filed with the Court and noticed for hearing.

On September 24, 1990 and October 2, 1990, Lois Bellman filed Motions for Order to Extend Time for Lois A. Bellman to Make Cash Payment to Chapter 7 Trustee. She identified the income sources from which she could make her payment to Trustee, as required by the August 6, 1990 oral stipulation, if given more time. FCBO, PCA, and Trustee all objected to the Motion. In their respective pleading, each party, including Lois Bellman, considered the oral stipulation binding. The Motion was dismissed by Order entered November 21, 1990 because Trustee stated he had received all funds Lois Bellman was required to pay under the terms of the stipulation. The November 21, 1990 Order also resolved an adversary proceeding commenced by Trustee wherein he sought a turnover of some cattle and a 1980 Lincoln

in Lois Bellman's possession that, according to her answer, she retained pursuant to the August 6, 1990 settlement.

On September 28, 1990, Debtors filed their Final Reports of Debtor Upon Conversion From Chapter 12 Case to a Chapter 7 Case Pursuant to Bankruptcy Rule 1019. Debtor–Bellman Farms' Final Report identified its accounts payable but did not acknowledge any lease or wage payments were owed to Lois Bellman. This Report stated that Debtor–Bellman Farms had executory machinery leases with Lois Bellman for "Cost for use at market rate." Debtor–Charles Bellman's Final Report did not state that he owed any funds to Lois Bellman nor did he state that he had any executory contracts with her.

On October 1, 1990, Debtors filed amendments to Schedules A–1 and A–3. These amended schedules recognized administrative claims by William J. Pfeiffer for legal services and Don Flanigan for contract wages in 1990. The amended schedules did not acknowledge that any sums were owed to Lois Bellman for wages incurred or machinery leased during the course of the Chapter 12.

Over the next several months, Trustee sold some estate real and personal property with Court approval. The Order Approving Sale of Personal Property Free and Clear of Liens entered September 19, 1990 allowed Trustee to sell a 510 combine, a hay rake, and a twenty-four foot vibra chisel for which Lois Bellman now seeks administrative lease payments from the estate.

On January 2, 1991 Lois Bellman filed three proofs of claim for: 1) $26,500.00 due August 6, 1990 for labor management at $10.00 per hour from January 1, 1987 through December 31, 1989 founded on an "Oral agreement based on going rates"; 2)

$40,924.10 due August 7, 1990 for "equipment lease for years 1987[,] 1988[,] 1989[,] and 1990 through August 6th"; and 3) $3,096.38 for "hail damage to 1980 T–Bird and 1980 Lincoln when both autos were being used in business of Debtors['] farm operation."

On May 17, 1991, Lois Bellman filed pro se three motions [6] in which she made administrate expense claims for: 1) $3,096.38 in insurance proceeds that Debtors collected on a 1980 Lincoln Continental and a 1980 Ford; 2) $26,500.00 for 2,560 hours of farm labor by Lois Bellman at $10.00 an hour between January 1, 1987 and December 31, 1989; and 3) $40,924.10 for equipment and machinery leased by Debtors from Lois Bellman in 1987, 1988, 1989, and 1990 (through August 6, 1990). Lois Bellman stated in the latter Motion that she and Debtors had an oral lease until January 15, 1990 when a written lease was entered into by Debtor Bellman Farms, Inc., and Lois Bellman. Objections to these Motions were filed by Trustee, FCBO, and PCA.

Movant Lois Bellman subsequently obtained counsel and a hearing on the Motions was rescheduled to and conducted on July 24 and 25, 1991.

At the hearing, Lois Vielmette, formerly Lois Bellman,[7] testified that she helped the bankruptcy estates by replacing the hired hand's pickup in December of 1986. She next bought a 1466 tractor in March of 1987 and in October of 1987 she purchased several pieces of equipment and a 1026 IHC tractor at the sale conducted by PCA. The source of funds for her purchase was the sale of cattle that Carmen Bellman gave Lois Bellman, cattle that Charles Bellman acquired during the Chapter 11, which he claims were not estate property, and cattle which Vielmette claims she owned.[8]

---

**6.** Lois Bellman filed her proofs of claim and motions for allowance of administrative claims against the estates of both Bellman Farms, Inc., and Charles J. Bellman. At the hearing she clarified that she was seeking payment only from the bankruptcy estate of Bellman Farms, Inc.

**7.** Lois Bellman and Charles Bellman divorced on June 5, 1991. It is unclear whether they now maintain separate residences.

**8.** Charles Bellman purchased cattle in his name or in the name of Ace Cattle Company during the pendency of his Chapter 11. He testified that the source of funds was compensation he received from Bellman Farms, Inc., and he erroneously argues that it was not property of his personal Chapter 11 estate. *See* 11 U.S.C. § 541 and Debtors' confirmed Chapter 11 plan.

Vielmette said she acquired more of the equipment leased to Debtors as a gift from Carmen Bellman in November, 1987. Vielmette stated she purchased a Flex-all and some junk from Debtors in November, 1987.

The machinery and cattle given to Lois Bellman was property that Carmen Bellman received in the September 14, 1987 settlement with PCA and Debtors. Neither Vielmette nor Carmen Bellman[9] had evidence that a gift tax was paid timely on these transfers. Carmen Bellman plead her privilege against self-incrimination under the Fifth Amendment when asked whether she had filed a gift tax return in connection with the property transfer.

Vielmette testified that on March 22, 1989 she bought a 1974 1466 HC tractor and a John Deere tandem disc from a Pierre implement dealer. Charles Bellman, however, signed the purchase order for the 1466 tractor and the disc in the name of Ace Land and Cattle Company.[10] The implement dealer received one check from Ace Land and Cattle Company for $2,057.41 and one from AVCO Financial Services of South Dakota, Inc., (AVCO) for $8,500.09 to cover the full purchase price of the 1466 tractor and disc. The AVCO funds were borrowed by Lois Bellman on March 22, 1989.

In late June, 1989, Lois Bellman purchased a New Holland baler from Leo O'Donnel, a swather from Merlin Kienow, and a Massey Ferguson combine and a John Deere combine from H.C. Clark Equipment Company. Another loan from AVCO for $2,320.22 and a deposit of $3,250.00 for "Equip. Lease" from Bellman Farms, Inc., were the source of funds for these purchases. The Retail Sales Order with the equipment company for the combines was signed "Lois Bellman by Charles J. Bellman".

Both Vielmette and Charles Bellman testified that AVCO would not lend money to Charles Bellman. The June 29, 1989 AVCO Approval Application was completed in the names of both "Chuck" Bellman and Lois Bellman. The financing statement and the Federal Disclosure Statement dated June 29, 1989, which secured the March and June, 1989 equipment purchases plus a New Holland Baler, were completed in Lois Bellman's name.

Vielmette and Charles Bellman testified that Debtors leased the equipment from Lois Bellman under an oral agreement until January 15, 1990 when their oral agreement was reduced to writing.

The rates charged, if not specifically stated in the written lease, were to be based on the going rate of local equipment dealers. Both Vielmette and Charles Bellman stated Charles Bellman had made several of Lois Bellman's loan payments to AVCO in lieu of direct lease payments. Neither provided a complete accounting of the funds paid by Charles Bellman or Bellman Farms to AVCO or Lois Bellman. Vielmette could not adequately explain why during her deposition on May 10, 1990 she did not remember that the January 15, 1990 written agreement existed. Likewise, Charles Bellman could not explain why during court testimony on July 30, 1990 he did not remember that a written lease was created on January 15, 1990. Neither Vielmette nor Charles Bellman produced any contemporaneous records of the actual hours the leased machinery was used by Bellman Farms, Inc. Vielmette said her total investment in machinery used by Bellman Farms, Inc. was $74,579.60. Debtors did not own or lease other equipment during their bankruptcy except for a tractor leased from H.C. Clark Equipment in Aberdeen in 1987. Debtors did not try to lease equipment from anyone else.

In a statement prepared December 31, 1990, Vielmette calculated Debtor–Bellman Farms, Inc., owed her $40,924.10 for the lease of her equipment in 1987 through August 6, 1990. The Statement seeks compensation for Debtors' lease of all the equipment and three vehicles listed in the

9. Carmen Bellman's testimony was submitted by a deposition taken June 11, 1990.

10. In at least one year after confirmation of Debtors' Chapter 12 plan (1988), Charles Bellman conducted business under the name Ace Land and Cattle Company as well as Bellman Farms, Inc.

lease agreement, except a post hole digger.[11] No other documents or testimony, other than her own and Charles Bellman's, were offered to support Vielmette's written statement. Moreover, except for one 1466 tractor, a loader, some panels and chutes, a 1980 Ford Thunderbird, a Dodge pickup, and a 1980 Lincoln Continental[12], Lois Bellman had agreed in the August 6, 1991 oral stipulation[13] to relinquish any interest she had in all the other machinery itemized in the lease dated January 15, 1990. In the stipulation negotiated at the August 6, 1990 hearing and in subsequent correspondence between the parties about the August 6, 1990 stipulation, Lois Bellman did not make any claim against the estate for equipment lease payments owed by Debtors.

During 1988 through 1990, Lois Bellman had her own cattle on or near estate property. She also rented crop and hay land in Faulkton. She paid some pasture rent to Bellman Farms, Inc. Debtors acknowledged ownership in few, if any, cattle while Debtors operated under their Chapter 12 plan.

Vielmette and Charles Bellman also testified about Debtors' relationship with Feather 'N Down, Ltd. Feather 'N Down is a hunting service owned by Vielmette and operated by her and Charles Bellman. It utilized Bellman Farm's real property as its headquarters and hunting preserve. Charles Bellman acted as a guide, helped raise game birds, and attended sports shows with Lois Bellman to solicit hunters. Vielmette testified that her and Charles Bellman's goal in creating Feather 'N Down was to pay Bellman Farms, Inc.'s debt.

Feather 'N Down did not pay any rent to Bellman Farms. A substantial amount of Feather 'N Down's expenses was paid by Charles Bellman, often through Bellman Farms, Inc. Don Flanigan, Bellman Farm's hired man, cared for game birds raised by Feather 'N Down. Charles Bellman said Feather 'N Down reimbursed him but he had no ledger that showed sums paid to or received from Feather 'N Down. Lois Bellman or LoBell Farms made payments for or loans to Bellman Farms, Inc., and occasionally paid Don Flanigan's wages. Vielmette did not present any ledger that showed funds she paid to or on behalf of Bellman Farms, Inc., equalled or exceeded funds or labor expended by Don Flanigan, Charles Bellman, Ace Land and Cattle Company, or Bellman Farms, Inc., on behalf of Feather 'N Down.

In addition to his labor for Feather 'N Down, Charles Bellman also worked for Lois Bellman at National Farm Management, Ltd., located in Waubay, South Dakota and Ogallala, Nebraska. Vielmette testified that National Farm Management did not pay Charles Bellman a wage but that she provided $8,000.00 to $9,000.00 a year in medicines, clothing, food, and lodging to him.

By a statement dated December 31, 1990, Vielmette claims she performed 2,650 hours of labor at $10.00 per hour from January 1, 1987 through December 31, 1989. She did not have a written employment contract with Debtors. She charged Debtors for a ten hour day for each day that her personal calendar said she was not working in Nebraska for National Farm Management. Her estimate of hours spent working for Debtors did not consider whether some of her time in South Dakota was spent working for herself, National Farm Management at its Waubay office, LoBell Farms, FAMINE, or Feather 'N Down. She did not provide any contemporaneous records of the work performed but testified that she essentially did any and all types of farm work that needed to be performed. She especially noted that she of-

---

**11.** During testimony, Vielmette stated that line two for lease payments sought for 1987 on her December 31, 1990 Statement should read "321 miles, Lincoln Continental @ $.25" rather than "321 miles, Ford T–Bird @ $.25."

**12.** The exhibits and testimony presented at the July 24, 1991 hearing did not clearly establish whether Debtors and Lois Vielmette owned one or two Lincoln Continental automobiles between them nor, if there were two Lincolns, was it clear upon which car Vielmette bases her administrative lease and hail damage claims.

**13.** To retain title to a Lincoln Continental, Vielmette paid Trustee $1,800.00 pursuant to the August 6, 1990 oral stipulation.

ten worked the hotter part of summer days since a medical condition limited Charles Bellman's ability to work in hot weather. She based her ten dollar an hour rate on the rate paid other hired laborers for Bellman Farms. She did not deduct from her claim the value of any labor performed by Don Flanigan or Charles Bellman for her or one of her corporations.

Vielmette testified that Bellman Farms, Inc., leased a 1980 Lincoln Continental and a 1980 Ford Thunderbird that she owned for Charles Bellman's personal and business use.[14] Lois Bellman bought the 1980 Lincoln from Bellman Farms, Inc., on May 10, 1987; the car title is in her name. The title for the Thunderbird in Lois Bellman's name is dated April 11, 1989. Under this oral agreement, Debtors were to maintain the cars in good repair, insure them, and return them in good repair.

The cars were damaged by hail in the autumn of 1989. Vielmette testified that she is entitled to an administrative expense claim for the insurance proceeds on these vehicles. She and Charles Bellman both stated they had a mutual understanding at some point in time that Lois Bellman would receive the insurance proceeds for the hail damage. Trustee received an insurance check for $700.00 for damage to the Thunderbird. Vielmette, Charles Bellman, and Trustee agreed that an insurance check for $2,900.00 was issued for the damage to the Lincoln but no one provided evidence of who received that check. Vielmette was not listed as the loss payee on the vehicle insurance policies obtained by Bellman Farms, Inc.

Vielmette's three administrative expense motions were taken under advisement on October 9, 1991 after receipt of proposed findings and conclusions and memorandums of law.

## II.

■ A Chapter 12 debtor may incur post-petition, unsecured debt in the ordinary course of business without court approval. 11 U.S.C. § 364(a). That debt is entitled to administrative priority for payment if it

meets the criteria of 11 U.S.C. § 503(b)(1). *White Front Feed & Seed, Division of Paul Lammers & Sons, Inc., v. State National Bank (In re Ramaker)*, 117 B.R. 959, 962 (Bankr.N.D. Iowa 1990); *In re Dakota Industries, Inc.*, 31 B.R. 23, 26 (Bankr.D.S.D.1983). Under 11 U.S.C. § 503(b)(1)(A), a party may be allowed an administrative expense for the "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]" The request is subject to notice and hearing upon motion filed by the entity seeking payment of the expense. 11 U.S.C. §§ 503(a) and 503(b)(1)(A); *Dakota Industries, Inc.*, 31 B.R. at 26. If allowed under § 503(b), an administrative expense claim has first priority, along with certain fees, over all other claims. 11 U.S.C. § 507(a)(1). When a reorganization or debt adjustment proceeding is converted to a Chapter 7 proceeding, administrative expenses incurred in the Chapter 7 have priority over administrative expenses incurred before the conversion. 11 U.S.C. § 726(b).

A Chapter 12 debtor-in-possession may incur unsecured debt not in the ordinary course of business only after court approval is obtained. 11 U.S.C. § 364(b). This type of debt also may be denominated as a priority administrative expense if it meets the criteria of § 503(b)(1).

■ Courts have generally construed narrowly the terms "actual" and "necessary" as set forth in § 503(b)(1). *NL Industries, Inc. v. GHR Energy Corp.*, 940 F.2d 957, 966 (5th Cir.1991) (citing *In re Dant & Russell, Inc.*, 853 F.2d 700, 706 (9th Cir.1988); *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir.1987); and *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986)). Consequently, not all debt incurred post-petition is entitled to priority as an administrative expense.

The threshold requirement, that the expense incurred be "actual" and "necessary" to the preservation of the estate,

---

**14.** These cars are also listed on the January 15, 1990 lease agreement signed by Charles Bellman, for Bellman Farms, Inc., and Lois Bellman.

... indicates Congress' intent that priority status be awarded parsimoniously to unsecured creditors who are also a party to an executory contract with the debtor over other unsecured creditors. It would be contrary to the purpose of the statute to saddle debtors with burdensome post-petition obligations or give preferential treatment to select creditors by creating a broad category of administrative expenses.

*In re ICS Cybernetics,* 111 B.R. 32, 36 (Bankr.N.D.N.Y.1989). A two-part test is often employed to determine whether the expense meets the criteria of § 503(b)(1). First, did the expense obligation arise post-petition? Second, did the expense benefit the debtor-in-possession in the operation of its business? *Ramaker,* 117 B.R. at 962 (cites therein); *ICS Cybernetics,* 111 B.R. at 37. A post-petition claim may still receive administrative priority although the reorganization was unsuccessful; the key issue is whether the transaction was beneficial to the estate, not whether a creditor should be compensated for a loss it experienced due to the debtor's possession of the creditor's property. *Ramaker,* 117 B.R. at 962; *ICS Cybernetics,* 111 B.R. at 36.

 The claimant must show that *other* unsecured creditors received tangible benefits from the services or goods provided by the claimant. *In re Jack Winter Apparel, Inc.,* 119 B.R. 629, 633 (E.D.Wisc. 1990); *Kinnan & Kinnan Partnership v. Agristor Leasing,* 116 B.R. 162, 166 (D.Neb.1990); *In re Herrick,* Bankr. No. 184–00041, slip op. at 2 (Bankr.D.S.D. May 9, 1988). Incidental benefit to the estate or extensive participation in the case, standing alone, is not a sufficient base for an administrative status. *Jack Winter Apparel, Inc.,* 119 B.R. at 633. A creditor's efforts undertaken solely to further its own self-interest is not compensable. *Id.*

 The burden of persuasion always remains with the claimant. *ICS Cybernetics,* 111 B.R. at 36. The claimant must show his entitlement to the administrative priority by a preponderance of evidence. *Firearms Import and Export Corp. v. United Capitol Insurance Co. (In re Firearms Import and Export Corp.),* 131 B.R.

1009 (Bankr.S.D.Fla.1991) (cases cited therein); *Jack Winter Apparel, Inc.,* 119 B.R. at 632; *In re Buttes Gas & Oil Co.,* 112 B.R. 191, 193 (Bankr.S.D.Tex.1989). The burden of production shifts to the objector if the claimant presents a prima facie case. *ICS Cybernetics,* 111 B.R. at 36.

### III.

Upon consideration of the facts before the Court and the applicable law, this Court concludes that Vielmette has failed to show by a preponderance of evidence that her unsecured claims are entitled to an administrative expense priority under §§ 503(b)(1) and 507(a)(1).

 *Wages and machinery lease prior to 1988.* Initially, the Court concludes that all Vielmette's claims for machinery lease payments and labor performed prior to 1988 must be denied. Debtors' Chapter 12 plan was not confirmed until February 26, 1988. Any pre-confirmation claims that Vielmette had for goods and services could and should have been acknowledged in the plan. Since none were, the Court will not at this juncture retroactively "amend" the plan to accommodate those claims.

 *Wages for 1988 and 1989.* Vielmette's evidence that she performed actual, necessary labor for Debtor–Bellman Farms from 1988 through 1989 is insufficient. Foremost, she kept no contemporaneous records and she offered no explanation of why her help was needed in addition to an apparently full-time hired hand. Her estimate of the time she spent working for Debtors based on the number of days she was absent from her National Farm Management office in Ogallala fails to account for her time spent on her own business interests in South Dakota, including her own farming and cattle, National Farm Management at its Waubay office, and Feather 'N Down. Second, Debtors' confirmed Chapter 12 plan did not contemplate that Debtors would operate the farm and incur debt for labor. General unsecured creditors and administrative priority claimants should not be punished with reduced claims for Debtors' decision to operate contrary to their Chapter 12 plan and incur a

major expense with an insider that was not projected in the plan. Finally, Vielmette failed to show that labor performed for her and her corporations by Charles Bellman and Dan Flanigan did not fully reciprocate for any work she performed for Debtors.

█ *Machinery lease for 1988 through August 6, 1990.* Vielmette has failed to show that Debtors' post-confirmation lease of machinery was an actual, necessary expense that benefitted anyone. Debtors' confirmed Chapter 12 plan did not contemplate that Debtors would actively farm. Consequently, it is difficult, if not impossible, to justify an administrative priority claim to an insider for a machinery lease that was never subject to Trustee's, creditors, or the Court's scrutiny. Second, no real benefit to the estate and creditors has been shown. The only evidence that continued farming benefitted the estate was cursory testimony that Debtors made most of their plan payments for two years before defaulting. However, there was no showing that Chapter 12 administrative claimants or general unsecured creditors benefitted. In fact, while Debtors were in Chapter 12 they incurred an additional $96,-399.46 in debt [15] and, for the two years that they operated after confirmation by farming themselves, Debtors realized $85,583.85 **less** income for plan payments than projected in their plan.[16] With those numbers, this Court concludes that Vielmette has failed to show that Debtors' lease of machinery produced any tangible benefits to creditors and the estate. While a successful reorganization was not required to show that the estates benefitted from the machinery lease, no benefit can be found when Debtors took giant steps further in debt through their post-confirmation business dealings with Vielmette.

█ Finally, the Court is unconvinced that Vielmette was owner in fact of the machinery. With few exceptions, it appears that most of the "leased" machinery was acquired with Bellman Farms funds that were funneled through Vielmette, property that was gifted to her by another insider, or funds that were borrowed solely for Debtors' benefit. The pervasive, unbridled transfer of assets among Debtors, Lois Vielmette, her corporations, and Ace Land and Cattle Company so muddied the waters that only a Herculean effort by Vielmette to show what was actually due her—after payments by Debtors on her or her corporations' behalf are deducted—could have allowed the Court to consider fully Vielmette's request for administrative expense priority. Sparse, self-serving, and cursory evidence is insufficient for allowance of a claim under § 503(b)(1). *See Buttes Gas & Oil Co.,* 112 B.R. at 196.

█ *Insurance proceeds on vehicles.* In order to qualify the insurance proceeds as an administrative expense, Vielmette needed to show that Debtor used the 1980 Lincoln Continental and 1980 Ford Thunderbird post-petition, that such use was necessary, and that the insurance proceeds constitute an actual cost of the lease of those vehicles. Vielmette has failed in this burden.

█ First, there is no evidence that Debtor used either vehicle post-confirmation. The only evidence that Vielmette introduced on Debtor's actual use of the vehicles was her itemized statement dated December 31, 1990. That statement, as amended at trial, states Debtor's employees drove the Lincoln 321 miles in 1987. While Vielmette testified that the statement erred in not including Debtors' use of the vehicles in subsequent years, there was no supplemental testimony or exhibits to correct that error and show Debtors' actual

---

**15.** This additional debt is set forth in the Final Report of Debtor Upon Conversion From Chapter 12 Case to Chapter 7 Case Pursuant to Bankruptcy Rule 1019.

**16.** This calculation is based on a comparison of the income and expenses projected in Debtors' confirmed Chapter 12 plan and Debtors' actual income and expenses for 1988 and 1989 as set forth in their Amended Motion for Modification of Chapter 12 Plan. Expenses for 1988 and 1989 in the Amended Motion for Modification included "interest", real estate taxes, some legal fees, and, for 1989 only, trustee fees. Other than the trustee fees, however, the Amended Motion did not clearly indicate whether these were plan payments or current expenses. Since they were listed in the Amended Motion as "operating" expenses, they are treated as such for this comparison.

use of the vehicles after 1987. Moreover, Charles Bellman drove the Lincoln for personal travel and on trips for National Farm Management. Second, it is difficult to envision how a luxury automobile was an appropriate, "necessary" vehicle for around-the-farm travel, especially when at least one Dodge pickup was available. Third, the insurance obtained by Debtors, which does not name Lois Bellman as the loss payee, and Vielmette's actions surrounding the August 6, 1990 settlement do not support her and Charles Bellman's testimony that they had an oral "understanding" Vielmette would receive the insurance proceeds. If that "understanding" had any weight, the insurance policy would have recognized it and Vielmette would have timely espoused a claim to the insurance proceeds during the settlement negotiations. Finally, Debtors' lease of these vehicles was not pre-approved by the Court under § 364(b) as an appropriate out-of-the-ordinary-course-of-business debt. General unsecured creditors and administrative priority claimants in this case should not be punished with reduced claims for Debtors' decision to incur an out-of-the-ordinary-course-of-business debt by leasing cars from an insider without appropriate notice and hearing.

An order will be entered denying Vielmette's Motions for Allowance of Administrative Claim.

So ordered.