**In re MOLNAR BROTHERS, A New Jersey Partnership, Debtor.**

**In re Steven MOLNAR and Florence Molnar, Debtors.**

**In re Andrew MOLNAR and Nancy Molnar, Debtors.**

**Bankruptcy Nos. 91–35776, 92–34917 and 92–34918.**

United States Bankruptcy Court, D. New Jersey.

Sept. 13, 1996.

David R. Forrey, Smith & Laquercia, Trenton, NJ, for Creditor, Plant Food Company, Inc.

John Bracaglia, Cohn & Bracaglia, Sommerville, NJ, for Debtor, Molnar Brothers.

Faith S. Hotchberg, United States Attorney by Janice Zerbe Bullard, Special Assistant United States Attorney, Newark, NJ, for United States of America, Consolidated Farm Agency of the Department of Agriculture.

Robert M. Wood, Law Office of Robert M. Wood, Manasquan, NJ, for Chapter 12 Trustee.

## OPINION

### WILLIAM H. GINDIN, Chief Judge.

### PROCEDURAL BACKGROUND

This matter comes before the court upon a Motion for Compensation Under the Chapter 12 Plan brought by creditor Plant Food Company, Inc. ("Plant Food") on December 6, 1995, for payment for seed and fertilizer provided to the Molnar Brothers ("Debtor") in 1993. The Debtor filed an objection and a hearing was held on February 15, 1996. The court reserved on the matter and permitted the parties to file proposed findings of fact and supplemental briefs. Plant Food, Robert M. Wood, the chapter 12 trustee ("Trustee"), and The United States Attorney each filed responses.

This court has jurisdiction over this issue pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference entered by the United States District Court for the District of New Jersey on July 23, 1984. Moreover, this is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (B).

### FACTUAL FINDINGS

On October 10, 1991, the Debtor as a general partnership, filed a bankruptcy petition under chapter 12 of title 11 of the United States Code. Steven Molnar and Andrew Molnar (sometimes cumulatively referred to as the "Molnars"), the general partners of the Debtor, operated its dairy farm located at 301 Marble Hill Road, Phillipsburgh, Harmony Township, New Jersey ("Farm"). The Debtor's petition states that livestock and crops of corn and hay were raised on the Farm. By certification, Steven Molnar states that the Debtor utilized its crops to feed the dairy herd.

On August 3, 1992, Steven Molnar and his wife Florence, and Andrew Molnar and his wife Nancy, filed joint petitions under chapter 13 of title 11, numbered (92–34917) and (92–34918), respectively. The court entered an order substantively consolidating the Debtor's case and the Molnars' individual cases under the chapter 12 case on April 22, 1993.

On June 26, 1992, the Debtor filed its plan of reorganization which provided that the creditors of the estate would be paid from the proceeds of the sale of the Debtor's real estate, livestock and equipment. On August 12, 1992, the Debtor filed its amended plan of reorganization with essentially the same liquidation terms ("Amended Plan").

Pursuant to the Amended Plan, the Debtor listed the Farm for private sale for two and one-half years without success. Because the Debtor was unable to sell the real estate by February 21, 1995, this court entered an order directing the Trustee to conduct an auction of the Debtor's assets. On June 27, 1995 the auction was held and the Debtor's real estate was purchased by the United States of America as a creditor for $370,-000.00. The remaining personalty was sold to other bidders. The first mortgage on the Farm along with certain administrative claims allowed by the court were satisfied by the proceeds of the sale. The auction did not produce sufficient funds to pay the holder of the second mortgage, the Farmer's Home Administration.

On December 6, 1995, Plant Food filed an administrative claim seeking payment for seed and fertilizer arising from a purchase by the Debtor in 1993, as a debtor-in-possession in chapter 12. During the spring of 1993, a sales representative from Plant Food visited the Molnars at the Farm and offered them corn seed, two types of fertilizer, sprayer and storage equipment, and a few gallons of herbicide used for weed control. Plant Food also proposed to supervise the Debtor's planting activity for that season. The Molnars purchased the products and planted 400 acres of corn during April of 1993, utilizing Plant Food's planting method. The Debtor also purchased additional herbicide from another supplier, Agway Milford ("Agway").

In May or June of 1993, the Molnars noticed that the crop was not thriving and the fields were besieged by weeds. The Molnars contacted Plant Food to advise the sales staff of the problem. In response, Plant Food sent a sales representative to visit the Farm on several occasions. During one June visit, the Plant Food representative was accompanied by an agent from Jacques Seed Company ("Jacques") who offered the Molnars replacement seed at a discounted price. Jacques also took soil and seed samples for analysis.

In a letter written to Steven Molnar dated July 15, 1993, Jacques reported that the samples revealed that the seed sold to the Debtor met the same germination standards of all of their products. Jacques also stated that the seed was planted in a "rough seed bed" and that moisture conditions were inadequate in the area at the time of planting. The Molnars also contacted Agway to respray the fields with herbicide; however, the application was too late in the season to control the weed growth.

During testimony, the Molnars stated that the Debtor's 1993 harvest yielded 42.7 bushels of corn per acre as compared with 120 to 130 bushels per acre from prior years. The Molnars claimed that the low yield resulted from Plant Food's process of mixing liquid fertilizer with the weed spray in one application process. Steven Molnar stated that the spraying application caused a portion of the nitrogen contained in the fertilizer and the weed spray to evaporate as the season became drier and conjectured that the remaining substances were not sufficient to nurture the plants and to inhibit the weeds.

Plant Food's witness, Theodore T. Platz, stated that although the company does not guarantee yields to its customers, the suggested application process was successful for other customers in the 1993 season. Mr. Platz also suggested that intervening factors contributed to the low yield such as inadequate herbicide levels, a malfunctioning combine harvester, and that the crop was eaten by deer. Neither party produced an expert witness. In the instant motion, Plant Food seeks to have the court declare its claim totaling $19,117.17 an administrative expense.

## DISCUSSION

**I. 11 U.S.C. § 503(b)(1)(A) Standard for an Administrative Claim.**

A chapter 12 debtor may incur post-petition, unsecured debt in the ordinary course of business without court approval. 11 U.S.C. § 364(a)[1]. Section 503(b)(1)(A) of the Bankruptcy Code (the "Code"), authorizes the court to grant an administrative claim for, "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). Section 507(a)(1) states that such expenses will be paid ahead of all other unsecured claims[2].

Allowances for administrative expenses are narrowly construed for proper protection of other creditors. *In re Cole,* 189 B.R. 40, 47 (Bankr.S.D.N.Y.1995) (citations omitted); *In re Lease–A–Fleet,* 140 B.R. 840, 844 (Bankr.E.D.Pa.1992). The priority embraces only those claims for costs that were actually and necessarily incurred in preserving the estate for the benefit of its creditors[3]. 11 U.S.C. § 503(b)(1)(A); *In re*

---

**1.** 11 U.S.C. § 364(a) provides: "[i]f the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense." Under 11 U.S.C. § 1203, the Debtor retained all of the rights and duties of a trustee (with certain exceptions not relevant here) because it operated the Farm as a debtor-in-possession.

**2.** 11 U.S.C. § 507(a)(1) states in pertinent part that, "[t]he following expenses and claims have priority in the following order: (1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28."

**3.** The Third Circuit has employed this same standard for post-petition claims for real estate taxes and water/sewer rents under 11 U.S.C. § 506(c). *United Jersey Bank v. Mitchell W. Miller (In re C.S. Associates),* 29 F.3d 903, 906 (3d Cir.1994). Section 506(c) provides that: "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the hold-

*Palau Corporation,* 139 B.R. 942, 944, *aff'd* 18 F.3d 746 (9th Cir.B.A.P.1994); *In re Sound Radio,* 145 B.R. 193, 211 (Bankr. D.N.J.1992). The policy behind giving priority to administrative claimants is to encourage creditors to supply necessary resources to debtors post-petition, *In re Grant Broadcasting of Philadelphia,* 71 B.R. 891, 897 (Bankr.E.D.Pa.1987), and to keep administrative costs to a minimum to preserve the debtor's estate. *In re Cole,* 189 B.R. at 47.

A claimant for an administrative award has the burden of proving that the Debtor's estate benefitted from the applicant's services to the extent of the claim allowed. *In re Mahoney–Troast Construction Company,* 189 B.R. 57, 58 (Bankr.D.N.J. 1995); *In re Hanlin Group, Inc.* 176 B.R. 329, 333 (Bankr.D.N.J.1995); *In re Lease–A–Fleet, Inc.,* 140 B.R. 840, 846 (Bankr.E.D.Pa. 1992). Unlike the burden of going forward which may shift to the objecting party, the burden of persuasion always remains with the claimant. *In re Bellman Farms, Inc.,* 140 B.R. 986, 994 (Bankr.N.D.S.D.1991).

To sustain its burden and thus qualify for administrative priority, the claimant must demonstrate by a preponderance of the evidence that the claim: (1) arises out of a post-petition transaction with the debtor (or trustee); and (2) benefits the estate. *In re Cole,* 189 B.R. at 47 (citing *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.),* 66 F.3d 1091, 1094 (9th Cir.1995)); *In re Chateaugay Corporation,* 102 B.R. 335, 353 (Bankr.S.D.N.Y.1989); *General Am. Trans. Corp. v. Martin (In re Mid Region Petroleum, Inc.),* 1 F.3d 1130, 1133 (10th Cir.1993); *Matter of Jartran, Inc.,* 732 F.2d 584, 587 (7th Cir.1984) (citing *In re Mammoth Mart,* 536 F.2d 950, 954 (1st Cir.1976)).

In order for an expenditure to qualify as "actual" and "necessary," it must benefit the estate as a whole. *In re Appliance*

*Store, Inc.,* 148 B.R. 234, 243 (Bankr.W.D.Pa. 1992); *In re Conroy,* 144 B.R. 966, 969 (Bankr.W.D.Pa.1992). Neither potential benefit to the estate nor mere possession will satisfy the actual and necessary costs provision of § 503(b)(1)(A). *Gen. Am. Trans. Corp.,* 1 F.3d at 1133. A creditor's efforts undertaken solely to further its own self-interest are not compensable. *In re Bellman Farms, Inc.,* 140 B.R. at 994 (citing *Jack Winter Apparel, Inc.,* 119 B.R. 629, 633 (E.D.Wis.1990)).

## II. Benefit to the Estate.

In this case, there is no dispute that the timing of purchase arose during the Debtor's chapter 12 case. The seed and fertilizer were bought by the Debtor in the spring of 1993 when the Farm was listed for private sale under the Debtor's Amended Plan. The court's administrative expense inquiry centers upon the second prong of the test, determining whether the estate has received an actual and necessary benefit.

Plant Food contends that the seed and chemicals offered a benefit to the Debtor because the products were used by the Debtor in the planting operation of the Farm and to feed the dairy herd during the winter months. The United States and the Trustee counter that although the Molnars may have benefitted from the seed and fertilizer individually, the Debtor operated the Farm under a liquidating plan and the products did not add any value to the property. It is clear and the court finds that the outcome of the bankruptcy is not the exclusive determination in projecting whether the transaction was beneficial to the estate. *White Front Feed & Seed v. State National Bank (In re Ramaker),* 117 B.R. 959, 961 (Bankr. N.D.Iowa 1990).

In *In re Ramaker,* the debtors were family farmers who purchased feed, seed and fertilizer from a supplier during the pendency of their chapter 11 case[4]. *Id.* at 959. Four

---

er of such claim." 11 U.S.C. § 506(c). *C.S. Associates* clarifies the standard for recovery under this section by stating that claims must: (1) be reasonable and necessary to the preservation or disposal of the property and (2) provide a direct benefit to the secured creditors. *Id.* (citations omitted).

4. The facts of *In re Ramaker,* 117 B.R. at 959, state that the debtors filed their joint petition in 1985, one year before the Bankruptcy Act of 1986 provided chapter 12 as an option for family farmers in need of financial rehabilitation. *See* H.R.Rep. No. 958, 99th Cong., 2d Sess., at 48–49

years later, the debtors voluntarily converted their case to one under chapter 7. *Id.* at 961. At the time of conversion, the debtors had accrued a $14,841.42 unpaid bill to the supplier. *Id.* After the court entered a § 348 order of discharge in the case, the supplier moved for summary judgment arguing that the debt incurred by the debtors during the chapter 11 was not discharged because it was an actual and necessary administrative expense of the estate under § 503(b)(1)(A). *Id.* The debtors opposed the motion by stating, *inter alia,* that the purchase had no beneficial effect on the estate because their reorganization had failed. *Id.* at 961. The court held that despite the evidence of the failure of the debtor's crop for that season and the conversion of their case, the sale of goods was still beneficial to the operation of the debtors' farm and the resulting claim warranted administrative status. *Id.* at 962.

Under *Ramaker,* the liquidating nature of the Debtor's estate does not extinguish the beneficial nature of Plant Food's products. Article Two of the Amended Plan specifically provides that the Molnars would first sell the real estate and then the 100 head of livestock and equipment to the extent necessary to pay all of the Debtor's creditors in full. In a Certification dated July 2, 1992, Steven Molnar also stated that the Debtor utilized its crops to feed the dairy herd[5]. It follows that the feeding of the livestock was an essential activity while the Farm was listed for sale in August of 1992 through the auction date of June 27, 1995 and that the 1993 crop was utilized as an actual and necessary expense of maintaining the Debtor's estate for that period. Accordingly, Plant Food's Claim warrants § 503(b)(1)(A) administrative status.

■■■ The court also recognizes that the Debtor's chapter 12 case was substantively consolidated[6] with the joint chapter 13

cases of each Molnar brother and their respective wives. Substantive consolidation is the merger of assets and liabilities of two or more estates, creating a common fund of assets and a single body of creditors. *Bracaglia v. Manzo (In re United Stairs Corporation),* 176 B.R. 359, 367 (Bankr.D.N.J.1995) (citing *In re Cooper,* 147 B.R. at 681, *In re Parkway Calabasas, Ltd.,* 89 B.R. 832, 837 (Bankr.C.D.Cal.1988), *aff'd* 949 F.2d 1058 (9th Cir.1991)).

■■■ The United States argues that the purchase of the seed and fertilizer provided a livelihood to the Molnars individually rather than to the liquidation value of the Debtors' estate. Under substantive consolidation, the Molnars' assets were merged with those of the Debtor. *Bracaglia v. Manzo,* 176 B.R. at 367. Any expenses incurred by the Debtor or the Molnars in maintaining the Debtor's estate would be subject to the same creditor body. *Id.* Thus, the individual chapter 13 estates were integrated under the consolidation and any benefit provided to the Molnars would be attributed to the operation of the Debtor's estate.

### III. *Debtor's Defense of Defective Products*

■■■ Once entitlement is established for an administrative claim, the burden of going forward to produce evidence sufficient to negate the *prima facie* validity of the filed claim shifts to the objector. *In re Bellman Farms, Inc.,* 140 B.R. 986, 994 (Bankr. N.D.S.D.1991). If the objector produces evidence sufficient to negate the validity of the claim, the ultimate burden of persuasion remains on the claimant to demonstrate by a preponderance of the evidence that the claim deserves to share in the distribution of the debtor's assets. *In re TM Carlton House Partners, Inc.,* 108 B.R. 512, 517, *aff'd,* 114

---

(1986) 1986 U.S.C.C.A.N. 5227; 11 U.S.C. § 1201 *et seq.*

5. This Certification was included as "Exhibit A" of Plant Food's Reply Brief, filed on April 17, 1996. The Certification was originally submitted with the Debtor's Motion to Stay Foreclosure, returnable on July 20, 1992.

6. Pursuant to 11 U.S.C. § 105(a), the bankruptcy court is granted equitable powers to carry out the provisions of the Bankruptcy Code and to prevent abuses of process. 11 U.S.C. § 105(a); *In re John Cooper,* 147 B.R. 678, 681 (Bankr. D.N.J.1992) (citations omitted). It is well settled that the bankruptcy court can order substantive consolidation of related cases in the exercise of its § 105(a) equitable powers. *Id.*

B.R. 81, *aff'd*, 928 F.2d 1131 (Bankr.E.D.Pa. 1989). In this case, the Debtor, through testimony[7], asserts that the failure of its 1993 corn crop can be attributed to defects in Plant Food's products and planting instructions, thus, abrogating the estate's obligation to pay the claim.

At the hearing, Steven and Andrew Molnar stated that the planting instructions required that they apply liquid fertilizer with the weed spray in one application process as opposed to "disking" dry fertilizer into the soil which they had success in past years. Steven Molnar also surmised that the spraying application caused a portion of the nitrogen contained in the fertilizer and the weed spray to evaporate as the season became drier and suspected that the remaining substances were not sufficient to nurture the plants and to inhibit the weeds. While the court respects the fact that the Molnars have been life long farmers, their testimony did not produce scientific evidence to determine that the feed, fertilizer or planting instructions were defective and the sole reason for the failure of the 1993 crop.

On page 63 of the transcript of the February 15, 1996 hearing ("Transcript"), Steven Molnar stated that Everett Chamberlain, the county agent from Warren County, was the only outside independent authority to visit the Farm. *Transcript*, p. 63, ¶¶ 10–25; p. 64, ¶¶ 1–17. The Molnars made no arrangements for testing to determine whether the products or the planting processes were proper. *Id.* The Molnars and the agent considered an option to bring in an individual from Cook College of Rutgers University to evaluate the weed situation but that alternative was discounted due to the Debtor's bankruptcy status. *Id.* Without the benefit of scientific analysis on behalf of the Debtor or testimony from an expert, the Debtor does not support a finding that Plant Food's products or its planting instructions were defective.

The Transcript is also replete with potential intervening factors which may have contributed to or caused the failure of the crop.

On pages 44–45, Steven Molnar stated in his cross-examination that the Debtor had purchased a majority of its herbicide for that season from Agway, another supplier. *Transcript*, p. 44, ¶¶ 5–6, 22–25; p. 45, ¶¶ 1–13. Although, Mr. Molnar conjectured that the Plant Food's application process of the herbicide was the cause of the problem, it is plausible that the weed growth could have been prompted from a defect in Agway's herbicide or any one of a number of intervening conditions.

Testimony was also given that the growth of the 1993 crop could have been affected by the hot and dry weather conditions of the season. *Transcript*, p. 24, ¶¶ 17–19; p. 73, ¶¶ 20–22. Once again, Steven Molnar suggested that an incorporation of the fertilizer into the soil may have sustained the crop despite the weather; however, no independent evidence was offered to support his opinion. *Transcript*, p. 24, ¶¶ 21–25; p. 25, ¶¶ 1–5. The Jacques letter written to Steven Molnar, dated July 15, 1993, further corroborates the weather conditions by stating that "[m]oisture conditions were inadequate in the area" at the time of planting. Testimony was also offered by Plant Food that the Debtor faced problems with its combine harvesting equipment in 1993. *Transcript*, p. 103, ¶¶ 17–25; p. 104, ¶¶ 1–9. Accordingly, the court finds that the Debtor has not met its burden of proof to prove its objection against Plant Food's administrative claim.

### CONCLUSION

For all of the above reasons, this court finds that Plant Food's claim totaling $19,-117.17, is an administrative expense of the Debtor's estate pursuant to 11 U.S.C. § 503(b)(1)(A). Counsel for Plant Food shall submit an appropriate form of order within ten (10) days.

---

**7.** The Debtor did not submit proposed findings of fact and conclusions of law after the February 15, 1996 hearing.