### In re MAHONEY–TROAST CONSTRUCTION COMPANY, Debtor.

#### Bankruptcy No. 92–21622 (NLW).

United States Bankruptcy Court, D. New Jersey.

Nov. 22, 1995.

Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen by John K. Sherwood, Roseland, New Jersey, for Trustee, Joseph Di Pasquale, Inc.

Broege, Neumann & Fischer by Timothy P. Neumann, Manasquan, New Jersey, for PLC Realty Associates.

*OPINION*

NOVALYN L. WINFIELD, Bankruptcy Judge.

THIS MATTER is before the Court upon the Motion for Entry of an Order Allowing and Directing Payment of an Administrative Expense Claim filed by PLC Reality Company. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference entered by the United States District Court of New Jersey on July 23, 1994. Moreover, this is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) & (B).

*BACKGROUND*

The administrative expense claim asserted by PLC Realty Company ("PLC") contains two components: (i) reimbursement of $85,892.30 which PLC alleges it had to expend *inter alia,* to remove two underground storage tanks and the surrounding contaminated soil, and (ii) reimbursement of $30,477.30 which PLC claims it expended in order to clean-up and dispose of the debtor's personal property which remained after the trustee completed the auction of the debtor's property. The only part of the claimed administrative expense presently under consideration

by the court is the request for reimbursement of the environmental remediation costs expended in connection with removal of the underground storage tanks and contaminated soil.

Until 1983, Mahoney–Troast Construction Co. ("Debtor") owned real property located at 790 Bloomfield Avenue in Clifton, New Jersey. The Debtor operated its construction business from the premises using the buildings on the property for office space and the outside yard to store equipment and conduct operations. In 1983 the Debtor sold the property to PLC and thereafter entered into two leases which allowed the Debtor to continue to use the office space and surrounding yard. The lease for the office was to expire on January 22, 1995, the lease for the outside yard was to expire in February of 1994.

At the time that PLC acquired the property, the debtor maintained two 2,000 gallon storage tanks to hold gasoline and diesel. In December, 1989, the Debtor, as a tenant of PLC, contracted with Della Volpe Bros. to remove the underground tanks. (Contreras Cert., Ex. N). In accordance with the then existing regulations and with the approval of a Clifton City inspector, the tanks were removed, but no soil was removed. (*Id.*). Thereafter, two 1,000 gallon tanks were installed. (Contreras Cert., Ex. M at 1).

On February 28, 1992, Debtor filed a Chapter 11 bankruptcy petition. The case was converted to a Chapter 7 on June 4, 1992. In order to liquidate estate assets, the trustee used and occupied the leased premises until October 15, 1992, when the trustee returned the keys to the premises to PLC. Neither the debtor nor the trustee assumed either lease, and the leases were deemed rejected pursuant to 11 U.S.C. § 365(d)(1).

On January 13, 1994, almost fifteen months after regaining possession of the premises, PLC conducted an investigation of the sub surface soil. Its investigation revealed soil contamination under the parking lot of the former Mahoney–Troast facility. The soil contamination was believed to have been caused by the two 2,000 gallon tanks the debtor had previously replaced, pre-petition. (Contreras Cert., Ex. M). Approximately 220 tons of contaminated soil were removed.

In addition, PLC elected to comply with the NJ Underground Storage Tank regulatory requirements and removed the two existing 1,000 gallon tanks. (Contreras Cert., Ex. M at 2). Those tanks were in excellent condition and were not believed to have been leaking. (*Id.*). PLC claims its work was necessary to comply with New Jersey law, although it does not specify which laws required the remediation or how the cleanup brought the property into compliance. It appears that PLC undertook the cleanup effort solely on its own initiative, without any state agency or officer ordering or determining that the cleanup was necessary. In the instant motion, PLC seeks to have the court declare its claim for reimbursement costs, totalling $85.892.30, an administrative expense.

### *DISCUSSION*

#### *I.*

Section 503(b)(1)(A) of the Bankruptcy Code ("the Code"), 11 U.S.C. et seq., authorizes the court to grant an administrative claim for, "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." Section 507 of the Code dictates that such expenses will be paid ahead of all other unsecured claims. The burden is upon the claimant to establish that its claim qualifies for allowance as an administrative expense. *In re Hemingway Transport Inc.*, 954 F.2d 1, 5 (1st Cir.1992).

To determine whether a claim should be accorded administrative expense status, it is necessary to consider when the claim arises. Since Code section 503(b) concerns itself with expenses incurred in connection with the bankruptcy estate, the expense must be one which arises post-petition. Typically, only debts incurred for the economic preservation of the bankruptcy estate are entitled to an administrative priority. *In re Dant & Russell, Inc.*, 853 F.2d 700, 706 (9th Cir.1988), citing *Matter of Baldwin–United Corporation*, 43 B.R. 443, 451 (S.D.Ohio 1984); *In re Armorflite Precision, Inc.*, 43 B.R. 14, affirmed 48 B.R. 994 (Bankr.D.Me.

1984); *In re Tri–L Corp.*, 65 B.R. 774 (Bankr.D.Utah 1986) (Administrative expense payments are reserved to those who either help preserve and administer the estate to the benefit of all of the estate's creditors).

The determination of when a claim arises has proved to be a particularly vexing question where an environmental injury which gives rise to liability occurs pre-petition, but the remediation costs are expended post-petition. Generally, environmental compliance costs which arise from the debtor's pre-petition conduct are treated as general unsecured claims. *Dant and Russell*, 853 F.2d at 709; *In re Great Northern Forest Products, Inc.*, 135 B.R. 46, 60–61 (Bankr. W.D.Mich.1991); *In re Kent Holland Die Casting & Plating, Inc.*, 125 B.R. 493, 503 (Bankr.W.D.Mich.1991). However, courts have found an exception to this general rule when the pre-petition environmental contamination also poses an identifiable and imminent harm in the post-petition period which requires the expenditure of funds to contain or remediate the problem. *In re Conroy*, 24 F.3d 568 (3d Cir.1994); *In re Chateaugay Corp.*, 944 F.2d 997, 1010 (2d Cir.1991); *In re Wall Tube & Metal Products Company*, 831 F.2d 118, 123–24 (6th Cir.1987); *In re Peerless Plating*, 70 B.R. 943, 948–49 (Bankr. W.D.Mich.1987). A number of courts which have found that post-petition costs of remediating a pre-petition environmental injury are properly classified as administrative expenses, rely on *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). *See, In re Wall Tube & Metal Products Company*, 831 F.2d at 123–24; *In re Conroy*, 24 F.3d at 570.

PLC argues that the holdings in *Midlantic* and *Conroy* definitively establish that the Bankruptcy Code does not provide a safe haven for polluters, and consequently, costs expended to remediate environmental pollution should be treated as an administrative expense. It further contends that *In re Torwico Electronics*, 8 F.3d 146, 151 (3d Cir. 1993) makes it abundantly clear that a debtor's responsibility for compliance with the environmental laws "runs with the waste," and thus it does not matter when the pollution occurred or when it was discovered.

The trustee counters that PLC reads the case authority too broadly, and that not every remediation claim can be elevated to the status of an administrative expense claim. He points out that the debtor did not own, but rather merely leased the property, and argues that this court should follow the holding in *Dant & Russell*, where the court held that the consequential damages resulting from the rejection of a lease, are treated as unsecured pre-petition claims. *Dant & Russell*, 853 F.2d at 709. In addition, the trustee proposes that this court further follow *Dant & Russell* and find that where an estate does not own the property in question, the remediation costs a landlord incurs do not preserve the bankruptcy estate.

Because *Midlantic* figures so prominently in the case authority applicable to a determination as to the status to be afforded PLC's claim for reimbursement an examination of its facts and holding is appropriate. *Midlantic* involved a chapter 7 trustee who sought to abandon property on which a debtor had stored waste oil contaminated with PCB, a highly toxic carcinogen. The debtor stored the waste oil during its pre-petition operations. Both state and local government authorities objected to the proposed abandonment on the grounds that it would threaten the public's health and safety, and would violate state and federal environmental laws. The Supreme Court held that a bankruptcy trustee "may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified harms." *Midlantic*, 474 U.S. at 502, 106 S.Ct. at 760. Importantly, the court also stated,

This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm. *Id.* at 507 n. 9, 106 S.Ct. at 762 n. 9.

Prior to the *Midlantic* decision, the Third Circuit appeared to interpret the Supreme Court's decision in *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) to require the denial of an administrative expense priority to a claim for costs incurred to comply with a regulatory agency's cleanup order. *Southern Ry. Co. v. Johnson,* 758 F.2d 137, 141 (3rd Cir.1985). However, the court's subsequent decision in *Commonwealth of Pennsylvania Department of Environmental Resources v. Conroy, (In re Conroy)* 24 F.3d 568 (3d Cir.1994) makes it doubtful that such an interpretation is appropriate. In *Conroy,* the court relied upon *Midlantic* to grant the Pennsylvania Department of Environmental Resources ("DER") an administrative claim for its costs to remove environmental contamination.

In *Conroy,* the DER ordered Conroy to arrange for the proper disposal of drums and canisters containing hazardous wastes. Conroy did not comply with the DER order, instead he and his wife filed a Chapter 11 bankruptcy petition. Fearful that the debtor's failure to remove the waste endangered public health, the DER initiated an "interim response," pursuant to Pa.Stat.Ann., tit. 35, § 6020.505(b), which allowed it to enter the property and effectuate a cleanup. After completing the cleanup, the DER moved to have its claim for reimbursement treated as an administrative expense. The bankruptcy court awarded the DER a $103,293.00 administrative claim for the cost of the cleanup contractor, but refused to grant the DER's request for an additional 10% to cover administrative and legal expenses. On appeal the District Court reversed and awarded the DER an administrative priority for the entire amount requested, and upon further appeal the Third Circuit affirmed the District Court's decision. *Conroy,* 24 F.3d at 570.

Relying on *Midlantic,* 474 U.S. 494, 106 S.Ct. 755; *Chateaugay,* 944 F.2d at 1009–10; and *Wall Tube & Metal,* 831 F.2d at 123–24, the court held that since the trustee could not abandon the property under *Midlantic,* the costs necessary to remedy the contamination were "necessary to preserve the estate." *Conroy,* 24 F.3d at 569–70. The court found that its prior ruling in *Southern Railway* did

not dictate a different result. It read *Southern Railway*

... to mean that a state administrative order requiring clean up of hazardous wastes may not be afforded priority over unsecured claims pursuant to 11 U.S.C. § 105(a), ... *Southern Railway* said nothing about whether a bankruptcy court may grant administrative expense priority to the costs that an environmental agency incurs in cleaning up a hazardous waste site that could not be abandoned under state law. 24 F.3d at 570.

Thus, in this circuit, it appears amply clear that expenses incurred post-petition to clean up continuing environmental hazards created pre-petition may be granted administrative expense priority.

However, recognizing the holding of *Conroy* does not compel the conclusion that it is applicable to the case *sub judice.* Indeed, there are important differences between *Conroy* and the instant case. First, and most importantly, there is absolutely nothing in the record before this court that indicates that the storage tanks or the contaminated soil posed an imminent threat to the public health. In fact PLC's expert noted that the removed tanks were in excellent condition and did not appear to be leaking. Although over two hundred tons of soil contaminated with gasoline and diesel were removed, nothing was presented to the court that indicated that the contamination was migrating so as to imperil adjacent properties or ground water. By contrast, in *Conroy,* upon inspection of the premises which the debtor abandoned, the DER found that drums and canisters of chemicals and solvents were left in a building with a leaking roof. Several of the drums had been sitting in water and were rusted on the bottom. *In re Conroy,* 153 B.R. 686, 687 (W.D.Pa.1993). The threat to the public from such a condition is readily apparent.

Secondly, unlike *Conroy, Chateaugay, Wall Tube,* or even *Torwico,* no regulatory authority has ordered the debtor to undertake a cleanup. Instead, PLC voluntarily undertook remediation of its own property and now seeks reimbursement from the estate. It is not even readily apparent how much of the cleanup was necessary, as PLC

cites to no specific statute. Moreover, arguably, the debtor performed the remediation work necessary to abate any imminent threat when it removed the leaking storage tanks in 1989. Further, it appears that the contaminated soil was not removed in 1989 because the regulations applicable at that time did not require removal.

Finally, as the trustee points out, the debtor did not own the property and cleanup was effected almost two years after the lease was rejected and the trustee returned the property to PLC. In short, unlike the site in *Conroy* it appears that, the property in the instant case could have been abandoned by the trustee because it posed no imminent threat to the public. *See In re Smith–Douglass, Inc.*, 856 F.2d 12, 16 (4th Cir.1988); *In re Purco*, 76 B.R. 523, 533 (Bankr.W.D.Pa. 1987); *In re FCX, Inc.*, 96 B.R. 49, 54–55 (Bankr.E.D.N.C.1989).

The court in *Conroy* addressed only the specific issue before it: whether the response costs incurred post-petition by a state agency to clean up an ongoing hazardous condition on a debtor's property are entitled to receive administrative expense priority. Unsurprisingly and sensibly the court answered in the affirmative. Notably, the court distinguished the matter before it from the *Dant & Russell* case:

> Contrary to the Conroys' suggestion, the Ninth Circuit's decision in *In re Dant & Russell, Inc.*, 853 F.2d 700 (1988), is also distinguishable. That case held that a lessor who has a bankruptcy claim against a lessee for the costs of cleaning up hazardous wastes deposited by the lessee on the leased property is not entitled to an administrative expense priority. *Conroy*, 24 F.3d at 570, n. 1.

Like the landlord in *Dant & Russell*, PLC has incurred certain costs that constitute part of its claim against the debtor, but these costs are entitled to no more than pre-peti-tion status. In light of the narrow ruling of *Conroy* this court will not extend its ruling to afford administrative expense status to the landlord's claim for reimbursement for costs incurred to remediate an environmental condition which did not pose an imminent threat to the public, and which involved property no longer leased or utilized by the bankruptcy estate.

## II.

Nor does the court find persuasive PLC's reliance on the holding in *Reading v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). In *Reading,* the court decided that damages resulting from the post-petition negligence of a receiver who was in charge of managing estate property should constitute an administrative expense. *Reading* and the cases PLC cites to the court[1] only indicate that post-petition activities which proximately cause damage should be granted an administrative expense. Expanding the rational of these cases to provide administration expense status to third party claims for costs incurred post-petition as a result of a pre-petition injury is unwarranted in the absence of a demonstration that there is an ongoing injury in the post-petition period.

## III.

Finally, PLC asserts that the *Torwico* decision supports its claim for administrative expense status. PLC's reliance on *Torwico* is equally misplaced. *Torwico* focused on whether a New Jersey Department of Environmental Protection and Energy (NJDEPE) cleanup order constituted a "claim" which could be discharged in bankruptcy.

In *Torwico,* the DEPE performed a post-petition inspection of property previously leased by the debtor. The DEPE found a hidden illegal seepage pit containing hazard-

---

**1.** *In Re Charlesbank Laundry,* 755 F.2d 200, 202 (1st Cir.1985) (court applies *Reading* to award an administrative claim to parties harmed by debtor in possession's **postpetition** violation of a civil injunction) (emphasis added); *In re N.P. Min. Co., Inc.,* 963 F.2d 1449, 1453 (11th Cir.1992) ("we find that punitive, civil penalties assessed for **postpetition** mining activities qualify as an administrative expense") (emphasis added); *In re Bill's Coal Co., Inc.,* 124 B.R. 827, 829 (D.Kan. 1991) ("This court agrees that penalties assessed for pre-petition misconduct or the continuing effects of pre-petition misconduct should not be considered an administrative expense.") (citations omitted).

ous wastes which were allegedly migrating into local waters. The DEPE subsequently issued an order which required Torwico to submit a closure plan for the pit. Torwico asserted that any obligation that it may have had was a claim barred by the DEPE's failure to file a claim prior to the bar date. The court ultimately determined that the DEPE had no "right to payment" that would constitute a claim. Rather, it had a right to force the debtor to comply with environmental laws to remedy a continuing problem. The court explicitly distinguished a cleanup order where payment in lieu of action was not authorized from an order under which reimbursement could have been sought. 8 F.3d at 150–51.

The distinguishing factor between the instant matter and *Torwico* is that in the instant matter PLC holds a claim. No regulatory authority is asserting a nondischargeable cleanup order. The *Torwico* decision is inapposite on the issue of the appropriate priority to be given to a cleanup reimbursement claim. The *Torwico* court explicitly stated that in order to find a cleanup obligation unavoidable, the wastes at issue must present an ongoing hazard. *Id.* at 150 (in order to not be a claim, the cleanup order must remedy, "an ongoing and continuing threat"), citing *In re CMC Heartland Partners,* 966 F.2d 1143, 1146–47 (7th Cir.1992).

The instant case lacks these dispositive elements. Rather, the court finds that the expense PLC seeks to impose upon the estate is part of its rejection damages and thus a pre-petition claim, not a nondischargeable cleanup· obligation. The contamination in *Torwico* presented a serious and ongoing threat to the public health. In the instant matter, the contamination did not pose the sort of threat to the public such that an immediate response was required, nor for that matter, was one performed.

### CONCLUSION

The court finds that the record before it does not support a finding that the contamination of the PLC property posed an imminent danger to the public. Accordingly, there is no basis to treat PLC's claim for reimbursement of cleanup costs in connection with remediation of a pre-petition environmental contamination as an administrative expense.