**In re G–I HOLDINGS, INC., Debtor.**

**No. 01–30135.**

United States Bankruptcy Court,
D. New Jersey.

April 7, 2004.

Dennis J. O'Grady, Esq., Riker, Danzig, Scherer, Hyland & Perretti LLP, Morris-town, NJ, for the Debtor G–I Holdings, Inc.

Richard G. Placey, Esq., Montgomery, McCracken, Walker & Rhoads, LLP, Cherry Hill, NJ, for the Novak Group.

Kenneth Rosen, Esq., Lowenstein Sandler P.C., Roseland, NJ, for the Official Committee of Asbestos Claimants.

## OPINION

DONALD H. STECKROTH,
Bankruptcy Judge.

Before the Court is the motion filed by The Novak Landfill RD/RA Group (hereinafter the "Novak Group") seeking an order requiring G–I Holdings, Inc. (hereinafter the "Debtor") to pay as an administrative expense, pursuant to § 503(b) of the Bankruptcy Code, remediation costs for environmental contamination at a landfill site located in Allentown, Pennsylvania. In addition, the Novak Group seeks an order directing the Debtor to either assume or reject an executory contract by a date to be fixed by the Court.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984. *See* 28 U.S.C. § 1334 (1993). This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (B). *See* 28 U.S.C. §§ 157(b)(2)(A) and (B) (1994). The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052. *See* Fed. R. Bankr.P. 7052.

## I. Findings of Fact

On January 5, 2001, G–I Holdings, Inc. filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The Debtor is the successor by merger to GAF Corporation (hereinafter

"GAF").[1] Prior to the Chapter 11 filing, GAF, along with several other entities, used a landfill known as the Novak Sanitary Landfill Site (hereinafter the "Site") for the purpose of disposing solid waste material. (*Certification of Leonard F. Charla*, Exhibit "A," pgs. 5–6)(hereinafter "*Charla Cert.*"). The Site is located in the northern portion of South Whitehall Township in Lehigh County, Pennsylvania. (*Charla Cert.*, ¶ 2). GAF operated a facility in Whitehall, Pennsylvania for the manufacture of linoleum flooring from which hazardous substances were transported to the Site in 1980 and 1981.

Beginning in the mid–1980's, the United States Environmental Protection Agency (hereinafter "EPA") conducted various tests of the soil, groundwater and surrounding well water located at the Site. (*Charla Cert.*, Exhibit "A," pgs. 8–14). As a result of these studies, the EPA determined that GAF and others[2] disposed of hazardous materials at the Site, resulting in the seepage of numerous toxic chemicals and metals into the surrounding soil, groundwater, and residential well water.[3] (*Brief on behalf of the Novak Group*, pg. 2)(hereinafter "*Novak Br.*"). The EPA concluded that the Site posed an "imminent and substantial endangerment to human health, welfare or the environment because of possible exposure to hazardous substances at concentrations that may re-sult in adverse health effects." (*Charla Cert.*, Exhibit "A," pg. 19).

On September 30, 1993, the EPA issued a Record of Decision (hereinafter "ROD") which contained a description of the remedial action selected by the EPA to be undertaken at the Site. (*Charla Cert.*, Exhibit "A," pg. 10). On June 30, 1995, the EPA issued an Administrative Order for Remedial Design and Remedial Action (hereinafter "Administrative Order") which incorporated the remedial action set forth in the ROD and ordered GAF and the other responsible parties to implement the remedy outlined by the EPA. (*Charla Cert.*, Exhibit "A," pg. 35). The Administrative Order contained the following provision: "[t]he failure by any [party] to comply with all or any part of this Order for which the [parties] are jointly and severally responsible shall not in any way excuse or justify noncompliance by the other [parties]." (*Charla Cert.*, Exhibit "A," pg. 2).

In an effort to comply with the EPA's Administrative Order, several parties scheduled in the Administrative Order, including GAF, entered into an agreement in August of 1995 identified as the "RD/RA Agreement," whereby the signatories pledged to effectuate the cleanup responsibilities contained in the Administrative Or-

---

1. The parties do not dispute that the Debtor is accountable for the liabilities incurred by GAF Corporation.

2. In addition to GAF, the following entities also contributed to the contamination at the Site as determined by the EPA: Air Products and Chemicals, Inc.; Amana Refrigeration, Inc.; American Nickeloid Company; Atlas Minerals and Chemicals, Inc.; AT & T Corporation; Boise Cascade Corporation; Fuller Company; General Electric Company; General Machine Corporation; Hilda T. Novak; Mack Trucks, Inc.; Novak Sanitary Landfill, Inc.; Olin Corporation; Pennsylvania Power and Light Company; Reckitt & Colman, Inc.; Stanley–Vidmar, Inc.; the Stroh Brewery Company; Tarkett, Inc.; and W.R. Grace & Co.-Conn. (*Charla Cert.*, Exhibit "A," pg. 2).

3. Examples of the hazardous materials discovered at the Site by the EPA include, but are not limited to, the following: acetone; antimony; arsenic; barium; benzene; beryllium; bis(2–ethylhexyl) phthalate; cadmium; chromium; copper; 1,2–dichloroethane; lead; mercury; phenol; tetrachloroethene; trichloroethene; vinyl chloride; xylene; and zinc. (*Charla Cert.*, Exhibit "A," pgs. 12–18).

der.[4] Pursuant to the terms of the RD/RA Agreement, the fourteen signatories organized in 1995 and identified themselves as the "Novak Site RD/RA PRP Group" (hereinafter the "Novak Group")(*Charla Cert.*, Exhibit "B").

The fundamental purpose of the RD/RA Agreement was to control the manner and means by which the Novak Group undertook obligations pursuant to the Administrative Order and to allocate among the members of the Novak Group all costs "incurred or to be incurred" as a result of the remediation efforts. (*Charla Cert.*, Exhibit "B," pg. 2). The signatories to the RD/RA Agreement allocated costs on the basis of percentage of waste contribution at the Site. Under the RD/RA Agreement, GAF bore responsibility for 17.53% of all cleanup costs. (*Charla Cert.*, Exhibit "C"). This was later reduced to 16.04%.

The RD/RA Agreement contains an Indemnification Section wherein each signatory agreed to indemnify each other from any claim, cost, expense or loss under the RD/RA Agreement and acknowledged no waiver or release of any contribution or indemnity claim or potential claim under the Administrative Order. (*Charla Cert.*, Exhibit "B," pg. 28).

Following the execution of the RD/RA Agreement, the Novak Group, including GAF, submitted a remediation plan to the EPA which was later approved by the agency. (*Certification of Mark Travers*, ¶ 4)(hereinafter "*Travers Cert.*"). The No-

vak Group thereafter commenced its remediation efforts at the Site pursuant to the plan approved by the EPA.

The Novak Group, including GAF, had been operating under the RD/RA Agreement for nearly five and one-half years when the Debtor (by this time successor by merger to GAF) filed for relief under Chapter 11 of the Bankruptcy Code. Despite the bankruptcy filing, post-petition remediation efforts at the Site continued. The projected total cost for the environmental remediation activities at the Site approximates $8.8 million.

Upon filing Chapter 11, the Debtor ceased paying its share of remediation costs. In addition to the failure of the Debtor to remit monetary payments for its share of the remediation costs, the Debtor also failed to contribute expertise and manpower to effectuate the EPA's Administrative Order. As of mid-August 2001, the Debtor's unpaid share of costs was $986,370.46 (*Dovell Cert.*, ¶ 10). It was estimated that the Debtor's total unpaid share of the costs of remediating the contamination at the Site would amount to $1,443,552.[5] (*Dovell Cert.*, ¶ 9).

No proof of claim has been filed by the Novak Group in the Debtor's Chapter 11 case.

## II. Legal Discussion

■ The Novak Group submits that the Debtor's share of remediation costs is en-

---

4. Specifically, the signatories to the RD/RA Agreement included the following fourteen entities: 1) Air Products and Chemicals, Inc.; 2) Amana Refrigeration, Inc.; 3) AT & T Corporation; 4) Boise Cascade Corporation; 5) BP America, Inc.; 6) GAF Corporation; 7) General Electric Company; 8) Ingersoll–Rand Company; 9) Mack Trucks, Inc.; 10) Packaging Corporation of America; 11) Pennsylva-

nia Power & Light Company; 12) the Stroh Brewery Company; 13) Tarkett, Inc.; and 14) W.R. Grace & Co.Conn. (*Charla Cert.*, Exhibit "B").

5. This figure appears subject to change based upon unexpected, unforeseen costs or additional cleanup requirements imposed by the EPA.

titled to administrative expense priority under § 503(b) of the Bankruptcy Code "on three independently sufficient grounds." *See* 11 U.S.C. § 503(b) (West 2004). (*Reply Brief of the Novak Group,* pg. 7)(hereinafter "*Novak Rep. Br.*"). First, the Novak Group contends that because the Administrative Order requires the remediation of an ongoing, imminent and substantial endangerment to human health and environment, the Debtor is required to comply with the Administrative Order postpetition and compliance costs are an administrative expense of the Debtor. (*Novak Rep. Br.,* pg. 7). Second, the Novak Group argues that under *Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.),* 744 F.2d 332 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), the Debtor's share of all sums incurred post-petition are non-dischargeable administrative obligations. (*Novak Rep. Br.,* pg. 8). Third, the Novak Group maintains that because the Debtor has not rejected the RD/RA Agreement, it is "entitled to an administrative claim for the Debtor's share of the post-petition costs incurred to date." (*Novak Rep. Br.,* pg. 8).

The Debtor, along with the Official Committee of Asbestos Claimants (hereinafter the "Committee"), object to and oppose the motion filed by the Novak Group. Succinctly stated, they argue that the Novak Group is nothing more than a group of private corporations seeking to have the Debtor pay a percentage share pursuant to a private, pre-petition contract allocating clean-up liability at a landfill the Debtor never owned nor operated. Thus, the Debtor and the Committee contend that the Novak Group is no different than any other monetary creditor of the Debtor. Each of the Novak Group's contentions will be addressed in turn.

## A. Whether the Debtor's Share of Post–Petition Remediation Costs is Entitled to Administrative Expense Priority under the Bankruptcy Code

The basis for the dispute involves § 503(b) of the Bankruptcy Code, which provides in relevant part: "[a]fter notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—(1)(A) the actual, necessary costs and expenses of preserving the estate...." *See* 11 U.S.C. § 503(b)(1)(A) (West 2004). Significantly, § 507 of the Bankruptcy Code dictates that such expenses will be paid ahead of all other unsecured claims. *See* 11 U.S.C. § 507 (West 2004).

Courts have established demanding criteria for determining whether a claim should be afforded an administrative priority. *In re Interstate Grocery Distributions Sys., Inc.,* 267 B.R. 907, 913 (Bankr.D.N.J.2001). Allowances for administrative expenses are "narrowly construed for [the] proper protection of other creditors." *In re Molnar Bros.,* 200 B.R. 555, 558 (Bankr.D.N.J.1996). The administrative expense priority only applies to those claims for costs "that were actually and necessarily incurred in preserving the estate for the benefit of its creditors." *Id.* In order for an expense to qualify as "actual" and "necessary," the claim must benefit the estate as a whole. *Id.* at 559 (citing *Montrose Ctr. v. Northeast Consumer Tech. Store, Inc. (In re Appliance Store, Inc.),* 148 B.R. 234, 243 (Bankr.W.D.Pa. 1992)).

Further, the claimant seeking an administrative expense award has the burden of proving by a preponderance of the evidence that the debtor's estate benefitted from the applicant's services to the extent of the claim allowed. *In re Molnar*

*Bros.,* 200 B.R. at 559. *In re Interstate Grocery Distributions Sys., Inc.,* 267 B.R. at 913 (holding that a claimant must demonstrate by a preponderance of the evidence entitlement to an administrative claim). To sustain its burden and thus qualify for administrative expense priority, the claimant must demonstrate by a preponderance of the evidence that the claim: 1) arises out of a post-petition transaction with the debtor; and 2) benefits the bankruptcy estate. *Id. See also In re Mahoney–Troast Constr. Co.,* 189 B.R. 57, 59 (Bankr.D.N.J.1995)("Since Code section 503(b) concerns itself with expenses incurred in connection with the bankruptcy estate, the expense must be one which arises post-petition. Typically, only debts incurred for the economic preservation of the bankruptcy estate are entitled to an administrative priority"). Consequently, the Novak Group bears the burden of demonstrating that the Debtor's post-petition share of remediation costs is entitled to priority treatment as an administrative expense.

■■ As recognized by this Court in *In re Mahoney–Troast Construction Co.,* the "determination of when a claim arises has proved to be a particularly vexing question where an environmental injury which gives rise to liability occurs pre-petition, but the remediation costs are expended postpetition." 189 B.R. at 60. Generally, however, environmental compliance costs which arise from the debtor's pre-petition conduct are treated as general unsecured claims. *Id.* (citing *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700, 709 (9th Cir.1988)). *See also Boyd v. Dock's Corner Assocs. (In re Great N. Forest Prods., Inc.),* 135 B.R. 46, 60–61 (Bankr. W.D.Mich.1991); *Windolph Trust v. Leitch*

*(In re Kent Holland Die Casting & Plating, Inc.),* 125 B.R. 493, 503 (Bankr. W.D.Mich.1991). Nevertheless, courts have imposed an exception to this general rule when the pre-petition environmental contamination "also poses an identifiable and imminent harm in the post-petition period which requires the expenditure of funds to contain or remediate the problem." *Id.* (citing *Commonwealth of Pa. v. Conroy,* 24 F.3d 568 (3d Cir.1994)).

The Novak Group relies on this exception, claiming that the Debtor's portion of the cost of complying with the EPA's Administrative Order is entitled to administrative expense priority because the Administrative Order "states that the remediation is necessary to address the ongoing, imminent and substantial threat to human health, welfare and the environment posed by the [Site]." (*Novak Br.,* pg. 8).[6] To substantiate its argument in this regard, the Novak Group relies principally on three reported decisions: *Commonwealth of Pennsylvania v. Conroy,* 24 F.3d 568 (3d Cir.1994); *Torwico Electronics, Inc. v. State of New Jersey (In re Torwico Electronics, Inc.),* 8 F.3d 146 (3d Cir.1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994); and *Coal Stripping, Inc. v. Clarendon National Insurance Co. (In re Coal Stripping, Inc.),* 222 B.R. 78 (Bankr.W.D.Pa.1998). However, these three cases do not support the position advanced by the Novak Group when applied to the unique and distinguishing facts of this case.

In *Conroy,* Frank Conroy operated and, through another corporation, owned a printing company. 24 F.3d at 569. After the printing company ceased operations, drums and canisters of hazardous waste were discovered on the premises. *Id.* The

---

6. For purposes of this motion, the Court will presume that this factual conclusion reached by the EPA is correct. The Debtor does not dispute this finding in its opposition papers.

Commonwealth of Pennsylvania Department of Environmental Resources (hereinafter "DER") ordered Conroy to properly dispose of the hazardous waste. *Id.* Conroy failed to comply with the order; instead, he and his wife filed for protection under Chapter 11 of the Bankruptcy Code. *Id.* Concerned that Conroy's failure to remove the hazardous waste was endangering public health and safety as well as the environment, the DER initiated an "interim response" to address the problem. *Id.* Through a private contractor, the DER cleaned up this facility and then filed an administrative expense claim with the bankruptcy court under 11 U.S.C. § 503(b)(1)(A), seeking to recover the costs the state agency had incurred. The debtor objected to the proof of claim filed by the DER seeking administrative expense priority.

The United States Court of Appeals for the Third Circuit held "that the costs incurred by the DER in contracting for cleanup of the printing facility were properly classified as administrative expenses." *Id.* at 570. Relying on decisions reached by the United States Courts of Appeals for the Sixth and Second Circuits, the Third Circuit reached its holding by reasoning "that since the estate could not avoid such costs through abandonment [under § 554 of the Bankruptcy Code], the 'expenses to remove the threat posed by such substances are necessary to preserve the estate.'" *Id.* (quoting *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1009–10 (2d Cir.1991)).

The Novak Group contends the *Conroy* decision stands for the proposition that "[i]f the Debtor does not comply [with the Administrative Order] and others are forced to incur obligations and costs to discharge the Debtor's obligations under ... [the] Administrative Order, the costs to discharge the Debtor's obligations are administrative expenses under § 503(b) in this bankruptcy case." (*Novak Br.*, pg. 12). However, the Novak Group's interpretation of the import of the *Conroy* decision is overly expansive.

As the Debtor correctly notes, the *Conroy* decision is fundamentally distinguishable from the present matter because in *Conroy* a state environmental regulatory agency incurred the expense of remediating the facility. In this case, by contrast, no remediation of the Site was conducted or paid for by the EPA. Rather, the Novak Group entered into a private contractual agreement whereby the fourteen private entities voluntarily agreed to coordinate their efforts and share in the costs of remediating the Site. As expressed in Section 2.1 of the RD/RA Agreement, the purpose of the agreement was to organize and jointly coordinate the signatories' efforts to comply with the terms of the Administrative Order and discharge their collective obligations under the RD/RA Agreement. (*Charla Cert.*, Exhibit "B").

In this matter, the absence of remediation efforts undertaken by a governmental agency and payment by that agency is critical because the *Conroy* decision does not indicate or suggest it applies to circumstances when private entities carry out and agree to pay for remediation efforts under an enforceable pre-petition agreement. To hold otherwise would judicially craft a more expansive exception to the general rule that environmental compliance costs which arise from pre-petition conduct are treated as general unsecured claims, and this Court declines to do so now. The *Conroy* decision neither explicitly nor implicitly states that a private party who undertakes pre-petition environmental cleanup efforts on behalf of itself as well as the debtor is entitled to an administrative expense priority claim under

§ 503(b)(1) of the Code for costs expended post-petition.

The Novak Group's reliance on *Torwico Electronics, Inc. v. State of New Jersey (In re Torwico Electronics, Inc.)*, 8 F.3d 146 (3d Cir.1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994) is also misguided. *Torwico* involved an attempt by the State of New Jersey to force a Chapter 11 debtor to comply with its obligations under federal and state environmental laws. *Id.* at 147. For a period of time, *Torwico Electronics, Inc.* (hereinafter *"Torwico"*) conducted a manufacturing business from a leased location in Ocean County, New Jersey. *Id.* On August 4, 1989, Torwico filed for Chapter 11 relief and listed the New Jersey Department of Environmental Protection and Energy (hereinafter "NJDEPE") as a creditor with a disputed and unliquidated claim. *Id.* The bankruptcy court sent notice to all creditors, including the NJDEPE, of Torwico's Chapter 11 bankruptcy and informed them that the last day to file a proof of claim was January 2, 1990. *Id.* Before that date, the NJDEPE performed an on-site inspection of the property once leased by Torwico and found a hidden illegal seepage pit containing hazardous wastes—wastes that were allegedly migrating into local waters. *Id.* The NJDEPE immediately issued a violation notice to Torwico with respect to the hazardous materials found at the property. Meanwhile, the January 2, 1990 deadline for filing a proof of claim passed without any filing by the NJDEPE. *Id.*

Despite the violation notice from the NJDEPE, Torwico failed to take any action to remedy the contamination at the property. *Id.* Consequently, the NJDEPE issued an Administrative Order and "Notice of Civil Administrative Penalty Assessment" to Torwico in connection with the environmental contamination of the property. *Id.* at 147–48.[7] Torwico and the NJDEPE subsequently filed cross-motions for summary judgment before the bankruptcy court, with Torwico seeking to avoid its obligations to the State of New Jersey by contending that the State of New Jersey's claims were barred by the absence of a claim filing prior to the expiration of the bar date. *Id.* at 148. The bankruptcy court agreed with Torwico and released the company from its obligations because the NJDEPE failed to timely file a proof of claim. *Id.* On appeal, the district court reversed the decision of the bankruptcy court. *Id.*

In the Third Circuit Court of Appeals, Torwico asserted that its obligations to the State of New Jersey constituted "claims" within the meaning of 11 U.S.C. § 101(5) of the Bankruptcy Code, and since the NJDEPE failed to timely file a proof of claim, it was no longer responsible for its obligations. *Id.* at 147. The NJDEPE asserted that what was involved were Torwico's "regulatory obligations," and not claims within the bankruptcy context. *Id.* In other words, the NJDEPE did not assert a debt or claim arguably entitled to administrative expense priority; rather, the NJDEPE sought "to remedy ongoing pollution by forcing Torwico to clean up the site." *Id.* at 149. Thus, the state agency sought remedial action pursuant to its police powers, not a money claim.

---

7. The Administrative Order issued by the NJDEPE provided in part as follows: "[n]o obligations imposed [by this Order] ... are intended to constitute a debt, damage claim, penalty or other civil action which should be limited or discharged in a bankruptcy proceeding. All obligations are imposed pursuant to the police powers of the State of New Jersey, intended to protect the public health, safety, welfare, and environment." 8 F.3d at 148.

Relying on the United States Supreme Court decision of *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Third Circuit Court of Appeals concluded that "[t]he state can exercise its regulatory powers and force compliance with its laws, even if the debtor must expend money to comply." *Torwico*, 8 F.3d at 150 (citation omitted). However, "[w]hat the state cannot do is force the debtor to pay money to the state; at that point, the state is no longer acting in its role as regulator, it is acting as a creditor." *Id.* Because the NJDEPE sought an injunction requiring Torwico to remediate the property in compliance with its environmental laws (which the Third Circuit Court of Appeals concluded did not amount to a "repackaging of a forfeited claim for damages") and not a monetary payment, the Third Circuit concluded that such a remedy did not constitute a "claim" as defined by the Bankruptcy Code. *Id.* at 151.

This Court strongly disagrees with the Novak Group's contention that the "holding that the debtor in *Torwico* was required to comply with the NJDEPE Administrative Order in that case applies with equal force to the Debtor and [the] EPA's Administrative Order in the instant case." (*Novak Br.,* pg. 11). Here, the EPA has not sought enforcement of its Administrative Order against the Debtor. In contrast, the NJDEPE in *Torwico* sought to have the court order remediation of the ongoing pollution on the property in accordance with the Administrative Order. *Id.* The NJDEPE did not seek administrative expense priority under § 503(b), nor could it have, because it did not clean up the property and thereafter could not seek reimbursement from Torwico.

The *Torwico* decision might apply with equal force to the present matter only if the EPA, a governmental agency exercising its police powers, was seeking to have this Court direct the Debtor to remediate the Site. The posture of this matter is markedly different from *Torwico* because here a conglomerate of private parties without police powers and contractually obligated to remediate the Site seek to obtain money from the Debtor rather than the EPA, a governmental agency, requesting an order that the Debtor take enforcement action to ameliorate an ongoing hazard. Consequently, the *Torwico* decision is inapposite to the facts before the Court and does not support a finding that the Debtor pay its percentage share of post-petition costs as an administrative expense to private parties remediating the Site.

Finally, the Novak Group's reliance on *Coal Stripping, Inc. v. Clarendon National Insurance Co. (In re Coal Stripping, Inc.),* 222 B.R. 78 (Bankr.W.D.Pa.1998) also fails to support its position. Prior to its filing for bankruptcy relief, Coal Stripping, Inc. (hereinafter "Coal Stripping") engaged in strip mining coal on property it leased in West Virginia. *Id.* at 79. In order to obtain a mining permit, West Virginia law required the posting of reclamation bonds. *Id.* Coal Stripping ceased operations prior to filing for bankruptcy and failed to reclaim the property in accordance with state law. *Id.* Consequently, its surety bonds were forfeited to the State of West Virginia. *Id.* The insurance companies argued that because the State of West Virginia would have an administrative claim if it reclaimed the property, the surety claim should have the same priority under § 509 of the Code as a subrogee to the right of the State of West Virginia. *Id.* at 80.[8]

8. Section 509 of the Code provides in relevant part: "[A]n entity that is liable with the debt- or on, or that has secured, a claim of a creditor against the debtor, and that pays

The bankruptcy court concluded that if "reclamation was performed post-petition the costs will be administrative expenses of this Chapter 11 bankruptcy estate." *Id.* at 82. In so holding, the court stated as follows:

> Because this is a [C]hapter 11 with a debtor-in-possession, to the extent the state of West Virginia expended money to perform postpetition clean-up, it would have an administrative expense claim. This is so, even though [Coal Stripping] did not operate in the [C]hapter 11. Its status as a debtor-in-possession carries with it certain obligations, including an on-going duty to restore the land. Therefore, [the insurance companies], as suret[ies] subrogated to the state's claim under § 509, will have administrative expense priority to the same extent enjoyed by West Virginia.
>
> [*Id.* at 82.]

Significantly, however, the court specifically noted that unless the insurance companies "establish the fact of and costs attendant to post-petition clean-up by West Virginia, their claim will simply be an unsecured claim for the payment of money." *Id.*

Although the *Coal Stripping* court implicitly held that a private party could be awarded administrative expense priority as part of an environmental remediation, this holding was explicitly predicated upon two factors completely absent in this matter: 1) a state agency actually performed the cleanup of hazardous materials on the property; and 2) the party seeking administrative expense priority for costs expended on the cleanup of the property was a surety of the debtor subrogated to the right of the government agency's adminis-

trative expense claim under § 509 of the Code. As noted, neither of these two conditions is present in this case. First, the Novak Group agreed to and has performed the cleanup of the Site, and not the EPA. Second, the Novak Group is not a surety of the Debtor and has no right to subrogation under § 509 of the Bankruptcy Code. Accordingly, the Novak Group's reliance upon *Coal Stripping* is untenable.

The Novak Group has not satisfied its burden of demonstrating that the Debtor's share of remediation costs is entitled to administrative expense priority pursuant to § 503(b) of the Bankruptcy Code under the *Conroy, Torwico,* or *Coal Stripping* decisions. Rather, the Novak Group's claim is a general, unsecured claim for the payment of money arising from the pre-petition conduct of the Debtor. *Coal Stripping,* 222 B.R. at 82.

**B. Whether the Debtor's Share of the Remediation Costs Incurred Post–Petition Constitute Obligations Entitled to Administrative Expense Priority**

In the alternative, the Novak Group contends the Debtor's share of post-petition cleanup costs is entitled to administrative expense priority for the independent reason that under *Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.),* 744 F.2d 332 (1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), the Debtor's share of all sums incurred after the filing date are non-dischargeable post-petition obligations. More specifically, the Novak Group asserts that even though the acts which support its cause of action for indemnity and contribution occurred prepetition, its right to payment

---

such claim, is subrogated to the rights of such creditor to the extent of such payment." 11

U.S.C. § 509(a)(West 2003).

from the Debtor arises post-petition and is thus a non-dischargeable post-petition obligation. (*Novak Br.*, pgs. 15–16).

The specific issues addressed by the *Frenville* decision involved relief from the automatic stay and when a right to payment for an indemnity or contribution claim arises if there is no specific agreement between the parties. 744 F.2d at 337. The Novak Group argues that this inquiry is analogous to the present matter because the Debtor's pre-petition acts of environmental contamination form the basis of the Novak Group's claim for contribution while the right to payment of its claim occurred post-petition. *Frenville*, however, did not involve an administrative expense claim.

The facts of *Frenville* are relatively straightforward. Accountants had performed accounting services, including the preparation of financial statements, for M. Frenville Co., Inc. before it and its principals filed for bankruptcy. *Id.* at 333. Several banks filed a state court action against the accountants and, in turn, the accountants sought relief from the automatic stay in order to proceed against the principals by joining them in the state court suit alleging indemnification and contribution claims. *Id.* at 333.

The bankruptcy and district courts held that the automatic stay was applicable to the accountants' lawsuit, concluding that the principals' liability, if any, resulted from their pre-petition acts. *Id.* at 333–34. On appeal, the Third Circuit Court of Appeals reasoned that the applicability of the automatic stay depended on whether the claim arose pre-petition and focused on the issue of at what point the accountants had a right to payment for the claim for indemnification or contribution. *Id.* at 336. In commencing its analysis of the *Frenville* facts, the Third Circuit Court of Appeals stated as follows:

*The present case is different from one involving an indemnity or surety contract. When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement. Such a surety relationship is the classic case of a contingent right to payment under the Code—the right to payment exists as of the signing of the agreement, but it is dependent on the occurrence of a future event.*

[*Id.* at 336–37 (internal citations omitted) (emphasis added).]

Since the accountants had no indemnity agreement with the Frenville principals, the Third Circuit concluded, "[a]ccordingly, cases holding that a claim arises upon the signing of an indemnity agreement are inapposite," and went on to ascertain when a right to payment for an indemnity or contribution claim arises in the absence of a specific agreement. *Id.* at 337. Here, of course, a specific agreement exists and thus *Frenville* is actually supportive of the Debtor's position.

The parties do not dispute the existence of an indemnification and contribution provision in the RD/RA Agreement, which provides in relevant part as follows:

Each Member agrees to indemnify, defend and hold harmless any Member and its representative(s) from and against any claim, demand, liability, cost, expense, legal fee, penalty, loss or judgment (collectively "liability") that in any way relates to the good-faith performance of any duties under this Agreement by any Member or its representative(s) on behalf of any Committee, subcommittee or the Group.... [N]othing in this Paragraph shall constitute a waiver or release of any contribution or indemnification claim or potential claim by any

Member that is reserved within the [Administrative] Order.

[ (*Charla Cert.*, Exhibit "B," pg. 28).] [9]

Unlike the situation in *Frenville*, the Debtor and the other members of the Novak Group had agreed to an explicit indemnification provision contained within the RD/RA Agreement. Thus, it is clear a right to payment, albeit contingent, existed pre-petition upon the execution of the RD/RA Agreement. Consequently, the Novak Group's reliance on *Frenville* is fundamentally flawed. Under the reasoning and clear holding in *Frenville*, the Novak Group's contractual claim for indemnification or contribution is a general unsecured pre-petition claim not entitled to priority under § 503(b) of the Bankruptcy Code.

### C. Whether the Debtor's Failure to Reject the RD/RA Agreement Entitles the Novak Group to an Administrative Claim for the Debtor's Share of Post–Petition Costs Incurred to Date

As a third independent reason for its position, the Novak Group avers that the Debtor's portion of post-petition remediation costs should be accorded administrative expense priority due to the Debtor's failure to reject the RD/RA Agreement. (*Novak Br.*, pg. 18). As previously articulated, in order for an expenditure to qualify as an administrative expense, the creditor must demonstrate that the claim: 1) arises out of a post-petition transaction between the creditor and the Debtor; and 2) the estate must receive a benefit from the transaction. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 532–33

(3d Cir.1999); *In re Molnar Bros.*, 200 B.R. at 559 (citations omitted). The Novak Group submits that both elements of this test have been satisfied because: 1) "the costs incurred by the Novak Group arose from a transaction with the Debtor whose postpetition benefits the Debtor elected to receive" and 2) "the Novak Group's performance under the [RD/RA Agreement] benefits the bankruptcy estate." (*Novak Br.*, pg. 22).

 With respect to an award of administrative expense priority under § 503(b) of the Code, it is "an absolute requirement" that the liability at issue arose post-petition. *Interstate Gas Supply, Inc. v. Wheeling Pittsburgh Steel Corp. (In re Pittsburgh–Canfield Corp.)*, 283 B.R. 231, 239 (Bankr.N.D.Ohio 2002). That is, a claimant must demonstrate a post-petition transaction with the debtor. *See generally In re Jartran, Inc.*, 732 F.2d 584, 587–88 (7th Cir.1984). The proper standard for determining a claim's administrative expense priority focuses on when the acts giving rise to the liability took place, not when they accrued. *In re Nationwise Automotive, Inc.*, 250 B.R. 900, 903 (Bankr.S.D.Ohio 2000) (citation omitted); *In re M Group, Inc.*, 268 B.R. 896, 901 (Bankr.D.Del.2001)(same). Moreover, the fact that a pre-petition obligation may be dependent upon the occurrence of a post-petition event does not make the obligation an administrative claim. *In re Waste Sys. Int'l, Inc.*, 280 B.R. 824, 828 (Bankr.D.Del.2002).

 "It is only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the debtor—give rise to a legal liability

---

9. The indemnification provision contains the usual exception that it does not apply to any 1) liability arising from a criminal proceeding where the Member or its representative(s) had reasonable cause to believe that the conduct in question was lawful; or 2) activity that constitutes gross negligence, or willful and wanton misconduct, or intentional malfeasance.

that the claimant is entitled to the priority of a cost and expense of administration." *Bachman v. Commercial Fin. Servs., Inc. (In re Commercial Fin. Servs., Inc.)*, 246 F.3d 1291, 1294 (10th Cir.2001)(quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 955 (1st Cir.1976)). Further, "[a] debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate." 246 F.3d at 1294 (citation omitted). Rather, to properly serve the underlying policy of administrative expense priority, "inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor." *In re Jartran*, 732 F.2d at 587 (emphasis in original). *See also In re Commercial Fin. Servs., Inc.*, 246 F.3d at 1294 ("It is crucial that the claimant's performance be induced by the debtor in possession").

Simply stated, the Novak Group fails to satisfy the first prong of the standard governing administrative expense priority because it cannot demonstrate a *post-petition* transaction with the Debtor. In order for administrative expense priority to apply, the liability must arise post-petition. It is not enough that the right to payment arose after the debtor in possession assumed control. *See In re Commercial Fin. Servs., Inc.*, 246 F.3d at 1294 (citation omitted). In this instance, the Debtor's liability for indemnification or contribution arose at the time the RD/RA Agreement was executed, almost six years before the filing for bankruptcy. The fact that the Debtor's obligation to indemnify the Novak Group continues to accrue post-petition does not transform the obligation into an administrative expense. *In re M Group, Inc.*, 268 B.R. at 901; *In re Waste Sys. Int'l, Inc.*, 280 B.R. at 828. The RD/RA Agreement is clearly a pre-petition

event and a pre-petition contractual liability—thus, a general unsecured claim. As such, the Novak Group entities are no different than any other monetary creditor of the Debtor. They are entitled to file a Proof of Claim and seek inclusion under the Debtor's Plan of Reorganization.

Since the Novak Group cannot satisfy the first prong of the § 503(b) analysis, it is not necessary to address whether the second prong has been satisfied. Nevertheless, the Court concludes the Novak Group also cannot demonstrate sufficient benefit to the Debtor's estate.

 Typically, only debts incurred for the economic preservation of the bankruptcy estate are entitled to an administrative priority. *In re Mahoney–Troast Constr. Co.*, 189 B.R. at 59 (citation omitted). Further, "[a] creditor's efforts undertaken solely to further its own self-interest are not compensable." *In re Molnar Bros.*, 200 B.R. at 559 (citing *In re Bellman Farms, Inc.*, 140 B.R. 986, 994 (Bankr.D.S.D.1991)). As the Debtor aptly notes, the Administrative Order holds all the entities jointly and severally responsible for the environmental contamination at the Site, and the failure of one responsible party to comply with the Administrative Order "shall not in any way excuse or justify noncompliance by the other [parties]." (*Charla Cert.*, Exhibit "A," pg. 2).

Because the Administrative Order makes each responsible party fully liable for complying with its terms, the Novak Group's continued payment of remediation costs advances its own self–interests, not simply the interest of the Debtor's estate. In order to avoid the assessment of civil penalties by the EPA, the remaining members of the Novak Group have no choice— they must continue the remediation efforts irrespective of whether the Debtor participates. When examined from this perspec-

tive, the Novak Group's payment is not an actual benefit to the estate directly furthering the Debtor's reorganization efforts. *See In re Mid–American Waste Sys., Inc.,* 228 B.R. 816, 821 (Bankr.D.Del.1999)(holding that a claimed expense must directly and substantially benefit the bankruptcy estate). As such, the Novak Group has not demonstrated a benefit to the Debtor's bankruptcy estate sufficient to satisfy the second prong of the § 503(b) analysis.

In its reply papers, the Novak Group attempts to support its claim for an administrative expense priority by asserting for the first time an additional argument; namely, it possesses a claim against the Debtor, not only under the RD/RA Agreement, but also pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 to 9675 (1995). This position was not argued in the original moving papers and is not set forth in a proof of claim or adversary proceeding in this Court.

Section 9613(f)(1) of CERCLA provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, *during or following any civil action* under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f)(1) (1995)(emphasis added). In turn, § 9607(a) of CERCLA provides that certain enumerated potentially responsible parties shall be liable for any other necessary costs of response incurred by any other person consistent with the national contingency plan. 42 U.S.C. § 9607(a)(1)-(4)(B) (1995). Thus, CERCLA specifically provides for a private right of action to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation. *Dedham Water Co. v. Cumber-*

*land Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989); *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.,* 915 F.2d 1355, 1357 (9th Cir.1990), *cert. denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991).

■ Moreover, an entity that is responsible for the remediation of a hazardous waste site under CERCLA may assert a claim for contribution against other responsible parties under § 9613(f). *New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1122 (3d Cir.1997). *See also SC Holdings, Inc. v. AAA Realty Co.,* 935 F.Supp. 1354, 1362 (D.N.J.1996)(holding that parties liable for at least a portion of the costs of remediating a hazardous site are limited to the contribution scheme under section 9613(f) of CERCLA).

In its reply papers, the Novak Group does not argue that a potential CERCLA contribution claim should be accorded administrative expense priority under § 503(b) of the Bankruptcy Code. Instead, the Novak Group conclusively states: "[w]hether or not the RD/RA Agreement ever existed, the Members of the Novak Group *would* have a contribution or indemnity claim under [CERCLA] against the Debtor for the response costs paid." (*Novak Br.,* pg. 15) (emphasis added). However, the issue of whether the Novak Group has a claim against the Debtor under § 9613(f) of CERCLA is not properly before the Court.

■ Contrary to the explicit language of § 9613(f), the Novak Group has not filed an adversary complaint against the Debtor seeking statutory contribution under CERCLA, which is a fundamental prerequisite to any such contribution claim. Merely stating a party would have a contribution or indemnity claim is not sufficient. Consequently, any alleged contribution claim the Novak Group may possess against the Debtor to recover a por-

tion of the post-petition cleanup costs is entirely contingent upon the Novak Group first filing a complaint, and then, more importantly, a judicial determination that the Novak Group can successfully establish a private cause of action against the Debtor under § 9613. This Court cannot summarily conclude, as the Novak Group implies, that the Debtor is liable to the Novak Group for contribution under CERCLA. This issue, an obvious afterthought by the Novak Group, is not properly before the Court at this time.

### D. Whether the Claim Asserted by the Novak Group Can be Disallowed by the Debtor under § 502(e)(1)(B) of the Bankruptcy Code

In opposition to the motion filed by the Novak Group, the Debtor submits that § 502(e)(1)(B) "requires the Court to disallow any contingent claims for contribution or reimbursement," which would apply to the Novak Group's "claims for future costs." (*Debtor's Br.*, pg. 17). Section 502(e)(1)(B) of the Code provides in relevant part:

> [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.
>
> [11 U.S.C. § 502(e)(1)(B) (West 2003).]

 This provision has generally been construed as requiring three elements: 1) the claim must be one for reimbursement or contribution; 2) the entity asserting the claim must be liable with the debtor on the claim of a creditor; and 3) the claim must be contingent at the time of its allowance or disallowance. *Al Tech*

*Specialty Steel Corp. v. Allegheny Int'l, Inc. (In re Allegheny Int'l, Inc.)*, 126 B.R. 919, 921 (W.D.Pa.), *aff'd without opinion*, 950 F.2d 721 (3d Cir.1991). In *Allegheny*, the district court concluded that neither the language of § 502(e)(1) nor its legislative history evidence congressional intent to exclude direct contingent claims. *Id.* at 922. Here, the funds have been expended and thus the claim to that extent is not contingent. In addition, since the Novak Group seeks to recover sums personally expended and to be expended by the Novak Group, as opposed to sums owed to a third party such as a governmental entity which has paid for the clean-up, the Debtor's liability is direct and not subject to disallowance under § 502(E)(1)(B), as a contingent liability.

### E. The Novak Group's Request to have the Court Compel the Debtor to Assume or Reject the RD/RA Agreement

In addition to the application for administrative priority treatment of its claims against the Debtor, the Novak Group also seeks to compel the Debtor to either assume or reject the RD/RA Agreement by a date to be set by the Court. The Novak Group contends that the RD/RA Agreement is an executory contract under 11 U.S.C. § 365. See 11 U.S.C. § 365 (West 2004). The Debtor does not dispute this characterization of the RD/RA Agreement.

 Section 365 of the Bankruptcy Code gives a debtor the right to assume or reject an executory contract. *In re Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J. 1986);11 U.S.C. § 365 (West 2004). Normally, a debtor may assume or reject an executory contract at any time before the confirmation of a plan of reorganization. *Id.*; 11 U.S.C. § 365(d)(2)(West 2004). Upon the request of a party to a contract with a debtor, a court may order the debt-

or to assume or reject the contract "within a specified period of time." *Id.*; 11 U.S.C. § 365(d)(2)(West 2004). What constitutes a reasonable time is left to the bankruptcy court's discretion in light of the circumstances of the particular case. *Id.* (citing *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir.1982)).

In determining what constitutes a reasonable time within which a debtor should assume or reject a contract, the court considers a number of factors, including: 1) the nature of the interests at stake; 2) the balance of the hurt to the litigants; 3) the good to be achieved; 4) the safeguards afforded those litigants; and 5) whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary. *In re Dunes Casino Hotel,* 63 B.R. at 949 (citations omitted). Most importantly, however, "the court should interpret reasonable time consistent with the broad purpose of Chapter 11, which is 'to permit [the] successful rehabilitation of debtors.'" *Id.* (quoting *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)).

The Novak Group asserts that a prompt deadline for assumption or rejection is appropriate because the EPA has determined that "immediate cleanup action is necessary" and because the Novak Group "needs to know whether the Debtor will honor its obligations under the [RD/RA] Agreement." (*Novak Br.*, pgs. 26–27). The Debtor contends that a fixed period of time for rejection or assumption is particularly unreasonable in light of the complexities of this case and notes that it is a multi-million dollar corporation with complex finances, faced with literally thousands of tort claims stemming from its alleged liability at one hundred and forty-two environmental sites. (*Debtor's Br.*, pg. 24). In addition, the Debtor points out that irrespective of a decision to assume or reject the RD/RA Agreement, compliance with the Administrative Order and the on-going remediation efforts at the Site will continue because the remaining members of the Novak Group are fully responsible and jointly liable for the contamination and clean-up. Thus, no harm or delay occurs with respect to the clean-up effort if the Debtor is not required to assume or reject the RD/RA Agreement at this time.

On balance, a consideration of the relevant factors requires that this Debtor be given time to formulate its Plan of Reorganization. The Court is well aware of the complexities of this asbestos related Chapter 11 proceeding. No possible benefit is accorded this estate if it is required to make a business judgment on issues not in proportion to the complexities of the total case before formulating its Plan of Reorganization. Thus, the Court will not impose a specified date by which the Debtor must assume or reject the RD/RA Agreement. As the Debtor aptly states, the only true concern here is the payment of money (which is relatively little in the context of this proceeding or the net worth of the parties involved) toward remediation of the Site which is more than adequately funded by the Novak Group. Whether the Debtor rejects or assumes the RD/RA Agreement by a specific date will not impede the actual cleanup of the hazardous contamination. No harm can result by the Debtor not deciding this issue until the formulation of a reorganization plan. Equally important, due to the nature, complexity, and sheer number of potential tort or environmental liabilities faced by the Debtor, requiring the Debtor to assume or reject the RD/RA Agreement will not promote or advance a successful rehabilitation until other elements of a Plan are negotiated. To the extent the Debtor is in the process of fashioning a global resolution of its envi-

ronmental liabilities with the appropriate governmental agencies, it should be provided adequate time to do so. Therefore, the Novak Group's request for the Court to fix a specific date by which the Debtor must either assume or reject the RD/RA Agreement is denied.

## III. Conclusion

For the reasons expressed, the Court denies the Novak Group's motion to have its request for indemnification or contribution classified as an administrative expense claim under § 503(b)(1) of the Bankruptcy Code. Further, the Court denies the Debtor's motion to disallow the Novak Group's claim under § 502(e)(1)(B) of the Code. Finally, the Novak Group's motion for the Court to fix a specified deadline for the Debtor to either assume or reject the RD/RA Agreement pursuant to § 365 of the Code is denied.